ALMENDAREZ-TORRES *v.* UNITED STATES

No. 96–6839.   Argued October 14, 1997—Decided March 24, 1998

BREYER, J., delivered the opinion of the Court, in which REHNQUIST, C. J., and O'CONNOR, KENNEDY, and THOMAS, JJ., joined. SCALIA, J., filed a dissenting opinion, in which STEVENS, SOUTER, and GINSBURG, JJ., joined, *post*, p. 248.

*Peter Fleury* argued the cause for petitioner. With him on the briefs was *Timothy Crooks*.

*Beth S. Brinkmann* argued the cause for the United States. With her on the brief were *Acting Solicitor General Dellinger, Acting Assistant Attorney General Keeney, Deputy Solicitor General Dreeben,* and *William C. Brown.**

JUSTICE BREYER delivered the opinion of the Court.

Subsection (a) of 8 U. S. C. § 1326 defines a crime. It forbids an alien who once was deported to return to the United States without special permission, and it authorizes a prison term of up to, but no more than, two years. Subsection (b)(2) of the same section authorizes a prison term of up to, but no more than, 20 years for "any alien described" in subsection (a), if the initial "deportation was subsequent to a conviction for commission of an aggravated felony." The question before us is whether this latter provision defines a separate crime or simply authorizes an enhanced penalty. If the former, *i. e.,* if it constitutes a separate crime, then the Government must write an indictment that mentions the additional element, namely, a prior aggravated felony conviction. If the latter, *i. e.,* if the provision simply authorizes an enhanced sentence when an offender also has an earlier conviction, then the indictment need not mention that fact, for the fact of an earlier conviction is not an element of the present crime.

We conclude that the subsection is a penalty provision, which simply authorizes a court to increase the sentence for a recidivist. It does not define a separate crime. Consequently, neither the statute nor the Constitution requires the

---

*\*Stephen R. Sady* and *Barbara E. Bergman* filed a brief for the National Association of Criminal Defense Lawyers as *amicus curiae.*

Government to charge the factor that it mentions, an earlier conviction, in the indictment.

I

In September 1995, a federal grand jury returned an indictment charging petitioner, Hugo Almendarez-Torres, with having been "found in the United States . . . after being deported" without the "permission and consent of the Attorney General" in "violation of . . . Section 1326." App. 3. In December 1995, Almendarez-Torres entered a plea of guilty. At a hearing, before the District Court accepted his plea, Almendarez-Torres admitted that he had been deported, that he had later unlawfully returned to the United States, and that the earlier deportation had taken place "pursuant to" three earlier "convictions" for aggravated felonies. *Id.*, at 10–14.

In March 1996, the District Court held a sentencing hearing. Almendarez-Torres pointed out that an indictment must set forth all the elements of a crime. See *Hamling* v. *United States*, 418 U. S. 87, 117 (1974). He added that his indictment had not mentioned his earlier aggravated felony convictions. And he argued that, consequently, the court could not sentence him to more than two years imprisonment, the maximum authorized for an offender without an earlier conviction. The District Court rejected this argument. It found applicable a Sentencing Guideline range of 77 to 96 months, see United States Sentencing Commission, Guidelines Manual § 2L1.2; ch. 5, pt. A (sentencing table) (Nov. 1995) (USSG), and it imposed a sentence of 85 months' imprisonment. App. 17.

On appeal the Fifth Circuit also rejected petitioner's argument. 113 F. 3d 515 (1996). Like seven other Circuits, it has held that subsection (b)(2) is a penalty provision that simply permits a sentencing judge to impose a higher sentence when the unlawfully returning alien also has a record of prior convictions. *United States* v. *Vasquez-Olvera*, 999

F. 2d 943, 945–947 (CA5 1993); see *United States* v. *Forbes*, 16 F. 3d 1294, 1297–1300 (CA1 1994); *United States* v. *DeLeon-Rodriguez*, 70 F. 3d 764, 765–767 (CA3 1995); *United States* v. *Crawford*, 18 F. 3d 1173, 1176–1178 (CA4 1994); *United States* v. *Munoz-Cerna*, 47 F. 3d 207, 210, n. 6 (CA7 1995); *United States* v. *Haggerty*, 85 F. 3d 403, 404–405 (CA8 1996); *United States* v. *Valdez*, 103 F. 3d 95, 97–98 (CA10 1996); *United States* v. *Palacios-Casquete*, 55 F. 3d 557, 559–560 (CA11 1995); cf. *United States* v. *Cole*, 32 F. 3d 16, 18–19 (CA2 1994) (reaching same result with respect to 8 U. S. C. § 1326(b)(1)).  The Ninth Circuit, however, has reached the opposite conclusion.  *United States* v. *Gonzalez-Medina*, 976 F. 2d 570, 572 (1992) (subsection (b)(2) constitutes separate crime).  We granted certiorari to resolve this difference among the Circuits.

## II

An indictment must set forth each element of the crime that it charges.  *Hamling* v. *United States, supra,* at 117. But it need not set forth factors relevant only to the sentencing of an offender found guilty of the charged crime.  Within limits, see *McMillan* v. *Pennsylvania,* 477 U. S. 79, 84–91 (1986), the question of which factors are which is normally a matter for Congress.  See *Staples* v. *United States,* 511 U. S. 600, 604 (1994) (definition of a criminal offense entrusted to the legislature, "'particularly in the case of federal crimes, which are solely creatures of statute'") (quoting *Liparota* v. *United States,* 471 U. S. 419, 424 (1985)).  We therefore look to the statute before us and ask what Congress intended. Did it intend the factor that the statute mentions, the prior aggravated felony conviction, to help define a separate crime?  Or did it intend the presence of an earlier conviction as a sentencing factor, a factor that a sentencing court might use to increase punishment?  In answering this question, we look to the statute's language, structure, subject matter, context, and history—factors that typically help courts determine a statute's objectives and thereby illuminate its text.

See, *e. g., United States* v. *Wells,* 519 U. S. 482, 490–492 (1997); *Garrett* v. *United States,* 471 U. S. 773, 779 (1985).

The directly relevant portions of the statute as it existed at the time of petitioner's conviction included subsection (a), which Congress had enacted in 1952, and subsection (b), which Congress added in 1988. See 8 U. S. C. § 1326 (1952 ed.), as enacted June 27, 1952, § 276, 66 Stat. 229; 8 U. S. C. § 1326 (1988 ed.) (reflecting amendments made by § 7345(a), 102 Stat. 4471). We print those portions of text below:

"§ 1326. Reentry of deported alien; criminal penalties for reentry of certain deported aliens.

"(a) Subject to subsection (b) of this section, any alien who—

"(1) has been . . . deported . . . , and thereafter

"(2) enters . . . , or is at any time found in, the United States [without the Attorney General's consent or the legal equivalent],

"shall be fined under title 18, or imprisoned not more than 2 years, or both.

"(b) Notwithstanding subsection (a) of this section, in the case of any alien described in such subsection—

"(1) whose deportation was subsequent to a conviction for commission of [certain misdemeanors], or a felony (other than an aggravated felony), such alien shall be fined under title 18, imprisoned not more than 10 years, or both; or

"(2) whose deportation was subsequent to a conviction for commission of an aggravated felony, such alien shall be fined under such title, imprisoned not more than 20 years, or both." 8 U. S. C. § 1326.

## A

Although the statute's language forces a close reading of the text, as well as consideration of other interpretive circumstances, see *Wells, supra,* we believe that the answer

to the question presented—whether Congress intended subsection (b)(2) to set forth a sentencing factor or a separate crime—is reasonably clear.

At the outset, we note that the relevant statutory subject matter is recidivism. That subject matter—prior commission of a serious crime—is as typical a sentencing factor as one might imagine. See, e. g., USSG §§ 4A1.1, 4A1.2 (Nov. 1997) (requiring sentencing judge to consider an offender's prior record in every case); 28 U. S. C. § 994(h) (instructing Commission to write Guidelines that increase sentences dramatically for serious recidivists); 18 U. S. C. § 924(e) (Armed Career Criminal Act of 1984) (imposing significantly higher sentence for felon-in-possession violation by serious recidivists); 21 U. S. C. §§ 841(b)(1)(A)–(D) (same for drug distribution); United States Sentencing Commission, 1996 Sourcebook of Federal Sentencing Statistics 35, 49 (for year ending Sept. 30, 1996, 20.3% of all federal cases involved offenders with substantial criminal records (criminal history categories IV–VI); 44.2% of drug cases involved offenders with prior convictions). Perhaps reflecting this fact, the lower courts have almost uniformly interpreted statutes (that authorize higher sentences for recidivists) as setting forth sentencing factors, not as creating new crimes (at least where the conduct, in the absence of the recidivism, is independently unlawful). E. g., United States v. McGatha, 891 F. 2d 1520, 1525 (CA11 1990) (18 U. S. C. § 924(e)); United States v. Arango-Montoya, 61 F. 3d 1331, 1339 (CA7 1995) (21 U. S. C. § 841(b)); United States v. Jackson, 824 F. 2d 21, 25, and n. 6 (CADC 1987). And we have found no statute that clearly makes recidivism an offense element in such circumstances. But cf. 18 U. S. C. § 922(g)(1) (prior felony conviction an element but conduct not otherwise unlawful).

With recidivism as the subject matter in mind, we turn to the statute's language. In essence, subsection (a) says that "any alien" once "deported," who reappears in the United

States without appropriate permission, shall be fined or "imprisoned not more than 2 years." Subsection (b) says that "any alien described in" subsection (a), "whose deportation was subsequent to a conviction" for a minor, or for a major, crime, may be subject to a much longer prison term.

The statute includes the words "subject to subsection (b)" at the beginning of subsection (a), and the words "[n]otwithstanding subsection (a)" at the beginning of subsection (b). If Congress intended subsection (b) to set forth substantive crimes, in respect to which subsection (a) would define a lesser included offense, see *Blockburger* v. *United States*, 284 U. S. 299, 304 (1932), what are those words doing there? The dissent believes that the words mean that the substantive crime defined by "subsection (a) is inapplicable to an alien covered by subsection (b)," *post*, at 264, hence the words represent an effort to say that a defendant cannot be punished for both substantive crimes. But that is not what the words say. Nor has Congress ever (to our knowledge) used these or similar words anywhere else in the federal criminal code for such a purpose. See, *e. g.*, 18 U. S. C. § 113 (aggravated and simple assault); §§ 1111, 1112 (murder and manslaughter); § 2113 (bank robbery and incidental crimes); §§ 2241, 2242 (aggravated and simple sexual abuse). And this should come as no surprise since, for at least 60 years, the federal courts have presumed that Congress does *not* intend for a defendant to be cumulatively punished for two crimes where one crime is a lesser included offense of the other. See *Whalen* v. *United States*, 445 U. S. 684, 691–693 (1980); *Blockburger, supra.*

If, however, Congress intended subsection (b) to provide additional penalties, the mystery disappears. The words "subject to subsection (b)" and "[n]otwithstanding subsection (a)" then are neither obscure nor pointless. They say, without obscurity, that the crime set forth in subsection (a), which both defines a crime and sets forth a penalty, is "sub-

ject to" subsection (b)'s different penalties (where the alien is also a felon or aggravated felon). And (b)'s higher maximum penalties may apply to an offender who violates (a) "notwithstanding" the fact that (a) sets forth a lesser penalty for one who has committed the same substantive crime. Nor is it pointless to specify that (b)'s punishments, not (a)'s punishment, apply whenever an offender commits (a)'s offense in a manner set forth by (b).

Moreover, the circumstances of subsection (b)'s adoption support this reading of the statutory text. We have examined the language of the statute in 1988, when Congress added the provision here at issue. That original language does not help petitioner. In 1988, the statute read as follows (with the 1988 amendment underscored):

"§ 1326. Reentry of deported alien; *criminal penalties for reentry of certain deported aliens.*

"*(a) Subject to subsection (b) of this section,* any alien who—

"(1) has been ... deported ... , and thereafter

"(2) enters ... , or is at any time found in, the United States [without the Attorney General's consent or the legal equivalent],

"shall be guilty of a felony, and upon conviction thereof, be punished by imprisonment of not more than two years, or by a fine of not more than $1,000, or both.

"*(b) Notwithstanding subsection (a) of this section, in the case of any alien described in such subsection—*

"*(1) whose deportation was subsequent to a conviction for commission of a felony (other than an aggravated felony), such alien shall be fined under title 18, imprisoned not more than 5 years, or both; or*

"*(2) whose deportation was subsequent to a conviction for commission of an aggravated felony, such alien shall be fined under such title, imprisoned not more than 15 years, or both.*" 8 U. S. C. § 1326 (1988 ed.) (emphasis added).

Thus, at the time of the amendment, the operative language of subsection (a)'s ordinary reentering-alien provision said that a reentering alien *"shall be guilty of a felony,* and *upon conviction thereof,* be punished by imprisonment of not more than two years, or by a fine of not more than $1,000." The 1988 amendment, subsection (b), by way of contrast, referred only to punishment—an increased punishment for the felon, or the aggravated felon, whom subsection (a) has "described." Although one could read the language, "any alien described in [subsection (a)]," standing alone, as importing subsection (a)'s elements into new offenses defined in subsection (b), that reading seems both unusual and awkward when taken in context, for the reasons just given. Linguistically speaking, it seems more likely that Congress simply meant to "describe" an alien who, in the words of the 1988 statute, was "guilty of a felony" defined in subsection (a) and "convict[ed] thereof."

As the dissent points out, *post,* at 265, Congress later struck from subsection (a) the words just quoted, and added in their place the words, "shall be fined under title 18, or imprisoned not more than two years." See Immigration Act of 1990 (1990 Act), § 543(b)(3), 104 Stat. 5059. But this amendment was one of a series in the 1990 Act that uniformly updated and simplified the phrasing of various, disparate civil and criminal penalty provisions in the Immigration and Naturalization Act. See, *e. g.,* 1990 Act, § 543(b)(1) (amending 8 U. S. C. § 1282(c)); § 543(b)(2)(C) (amending 8 U. S. C. § 1325); § 543(b)(4) (amending 8 U. S. C. § 1327); § 543(b)(5) (amending 8 U. S. C. § 1328). The section of the Act that contained the amendment is titled "Increase in Fine Levels; Authority of the INS to Collect Fines," and the relevant subsection, simply "Criminal Fine Levels." 1990 Act, § 543(b), 104 Stat. 5057, 5059. Although the 1990 amendment did have the effect of making the penalty provision in subsection (a) (which had remained unchanged since 1952) parallel with its counterparts in later enacted subsection (b),

neither the amendment's language, nor the legislative history of the 1990 Act, suggests that in this housekeeping measure, Congress intended to change, or to clarify, the fundamental relationship between the two subsections.

We also note that "the title of a statute and the heading of a section" are "tools available for the resolution of a doubt" about the meaning of a statute. *Trainmen* v. *Baltimore & Ohio R. Co.*, 331 U. S. 519, 528–529 (1947); see also *INS* v. *National Center for Immigrants' Rights, Inc.*, 502 U. S. 183, 189 (1991). The title of the 1988 amendment is "Criminal *penalties* for reentry of certain deported aliens." § 7345, 102 Stat. 4471 (emphasis added). A title that contains the word "penalties" more often, but certainly not always, see *post*, at 266–267, signals a provision that deals with penalties for a substantive crime.

In this instance the amendment's title does not reflect careless, or mistaken, drafting, for the title is reinforced by a legislative history that speaks about, and only about, the creation of new penalties. See S. 973, 100th Cong., 1st Sess. (1987), 133 Cong. Rec. 8771 (1987) (original bill titled, "A bill to provide for additional criminal penalties for deported aliens who reenter the United States, and for other purposes"); 134 Cong. Rec. 27429 (1988) (section-by-section analysis referring to Senate bill as increasing penalties for unlawful reentry); *id.*, at 27445 (remarks of Sen. D'Amato) (law would "increas[e] current penalties for illegal reentry after deportation"); *id.*, at 27462 (remarks of Sen. Chiles) (law would "impose stiff penalties" against deported aliens previously convicted of drug offenses); 133 Cong. Rec. 28840–28841 (1987) (remarks of Rep. Smith) (corresponding House bill creates three-tier penalty structure). The history, to our knowledge, contains no language at all that indicates Congress intended to create a new substantive crime.

Finally, the contrary interpretation—a substantive criminal offense—risks unfairness. If subsection (b)(2) sets forth a separate crime, the Government would be required to

prove to the jury that the defendant was previously deported "subsequent to a conviction for commission of an aggravated felony." As this Court has long recognized, the introduction of evidence of a defendant's prior crimes risks significant prejudice. See, *e. g.*, *Spencer* v. *Texas*, 385 U. S. 554, 560 (1967) (evidence of prior crimes "is generally recognized to have potentiality for prejudice"). Even if a defendant's stipulation were to keep the name and details of the previous offense from the jury, see *Old Chief* v. *United States*, 519 U. S. 172, 178–179 (1997), jurors would still learn, from the indictment, the judge, or the prosecutor, that the defendant had committed an *aggravated* felony. And, as we said last Term, "there can be no question that evidence of the . . . *nature* of the prior offense," here, that it was "aggravated" or serious, "carries a risk of unfair prejudice to the defendant." *Id.*, at 185 (emphasis added). Like several lower courts, we do not believe, other things being equal, that Congress would have wanted to create this kind of unfairness in respect to facts that are almost never contested. See, *e. g.*, *United States* v. *Forbes*, 16 F. 3d, at 1298–1300; *United States* v. *Rumney*, 867 F. 2d 714, 718–719 (CA1 1989); *United States* v. *Brewer*, 853 F. 2d 1319, 1324–1325 (CA6 1988) (en banc); *United States* v. *Jackson*, 824 F. 2d, at 25–26; *Government of Virgin Islands* v. *Castillo*, 550 F. 2d 850, 854 (CA3 1977).

In sum, we believe that Congress intended to set forth a sentencing factor in subsection (b)(2) and not a separate criminal offense.

## B

We must also consider several additional arguments that have been or might be made for a contrary interpretation of the statute. First, one might try to derive a congressional intent to establish a separate crime from the *magnitude* of the increase in the maximum authorized sentence. The magnitude of the change that Congress made in 1988, however, proves little. That change—from a 2-year maximum to 5- and 15-year maximums—is well within the range

set forth in other statutes that the lower courts have generally interpreted as providing for sentencing enhancements. Compare 8 U. S. C. § 1326 (1988 ed.) with 21 U. S. C. §§ 841(b)(1)(B) and (D) (distributing less than 50 kilograms of marijuana, maximum 5 years; distributing 100 or more kilograms of marijuana, 5 to 40 years), §§ 841(b)(1)(A) and (C) (distributing less than 100 grams of heroin, maximum 20 years; distributing 1 kilogram or more of heroin, maximum of life imprisonment), § 841(b)(1)(B) (distributing 500 grams or more of cocaine, 5 to 40 years; same, with prior drug felony conviction, 10 years to life); § 962 (doubling maximum term for second and subsequent violations of drug importation laws); 18 U. S. C. § 844 (using or carrying explosive device during commission of felony, maximum 10 years; subsequent offense, maximum 20 years); § 2241(c) (sexual abuse of children, maximum life; second offense, mandatory life); § 2320(a) (trafficking in counterfeit goods, maximum 10 years; subsequent offense, maximum 20 years). Congress later amended the statute, increasing the maximums to 10 and to 20 years, respectively. Violent Crime Control and Law Enforcement Act of 1994, §§ 130001(b)(1)(B) and (b)(2), 108 Stat. 2023. But nothing suggests that, in doing so, Congress intended to transform that statute's basic nature. And the later limits are close to the range suggested by other statutes regardless.

Second, petitioner and the dissent point, in part, to statutory language that did not exist when petitioner was convicted in 1995. Petitioner, for example, points out that in 1996, Congress added two new subsections, (b)(3) and (b)(4), which, petitioner says, created new substantive crimes. See Antiterrorism and Effective Death Penalty Act of 1996, § 401(c), 110 Stat. 1267 (adding subsection (b)(3)); Illegal Immigration Reform and Immigrant Responsibility Act of 1996 (IIRIRA), § 305(b), 110 Stat. 3009–606 to 3009–607 (adding subsection (b)(4)). Both petitioner and the dissent also refer to another 1996 statutory provision in which Congress used

the word "offense" to refer to the subsection now before us. See IIRIRA, § 334, 110 Stat. 3009–635.

These later enacted laws, however, are beside the point. They do not declare the meaning of earlier law. Cf. *Federal Housing Administration* v. *Darlington, Inc.*, 358 U. S. 84, 90 (1958). They do not seek to clarify an earlier enacted general term. Cf. *Red Lion Broadcasting Co.* v. *FCC*, 395 U. S. 367, 380–381 (1969). They do not depend for their effectiveness upon clarification, or a change in the meaning of an earlier statute. Cf. *Seatrain Shipbuilding Corp.* v. *Shell Oil Co.*, 444 U. S. 572, 595–596 (1980). They do not reflect any direct focus by Congress upon the meaning of the earlier enacted provisions. Cf. *ibid.; Darlington, supra,* at 86. Consequently, we do not find in them any forward looking legislative mandate, guidance, or direct suggestion about how courts should interpret the earlier provisions.

Regardless, it is not obvious that the two new subsections to which petitioner points create new crimes (a matter on which we express no view) nor, in adding them, did Congress do more than leave the legal question here at issue where it found it. The fact that Congress used a technical, crime-suggesting word—"offense"—eight years later in a different, and minor, statutory provision proves nothing—not least because it is more than offset by different words in the same later statute that suggest with greater force the exact opposite, namely, the precise interpretation of the relation of subsection (b) to subsection (a) that we adopt. See IIRIRA, § 321(c), 110 Stat. 3009–628 (stating that a new definition of "aggravated felony" applies *"under"* subsection (b) *"only to violations"* of subsection (a)).

Finally, petitioner and the dissent argue that the doctrine of "constitutional doubt" requires us to interpret subsection (b)(2) as setting forth a separate crime. As Justice Holmes said long ago: "A statute must be construed, if fairly possible, so as to avoid not only the conclusion that it is unconstitutional but also grave doubts upon that score." *United*

*States* v. *Jin Fuey Moy*, 241 U. S. 394, 401 (1916) (citing *United States ex rel. Attorney General* v. *Delaware & Hudson Co.*, 213 U. S. 366, 408 (1909)); see also *Ashwander* v. *TVA*, 297 U. S. 288, 348 (1936) (Brandeis, J., concurring). "This canon is followed out of respect for Congress, which we assume legislates in the light of constitutional limitations." *Rust* v. *Sullivan*, 500 U. S. 173, 191 (1991); see also *FTC* v. *American Tobacco Co.*, 264 U. S. 298, 305–307 (1924). The doctrine seeks in part to minimize disagreement between the branches by preserving congressional enactments that might otherwise founder on constitutional objections. It is not designed to aggravate that friction by creating (through the power of precedent) statutes foreign to those Congress intended, simply through fear of a constitutional difficulty that, upon analysis, will evaporate. Thus, those who invoke the doctrine must believe that the alternative is a serious likelihood that the statute will be held unconstitutional. Only then will the doctrine serve its basic democratic function of maintaining a set of statutes that reflect, rather than distort, the policy choices that elected representatives have made. For similar reasons, the statute must be genuinely susceptible to two constructions after, and not before, its complexities are unraveled. Only then is the statutory construction that avoids the constitutional question a "fair" one.

Unlike the dissent, we do not believe these conditions are met in the present case. The statutory language is somewhat complex. But after considering the matter in context, we believe the interpretative circumstances point significantly in one direction. More important, even if we were to assume that petitioner's construction of the statute is "fairly possible," *Jin Fuey Moy, supra,* at 401, the constitutional questions he raises, while requiring discussion, simply do *not* lead us to doubt gravely that Congress may authorize courts to impose longer sentences upon recidivists who commit a particular crime. The fact that we, unlike the dissent, do

not gravely doubt the statute's constitutionality in this respect is a crucial point. That is because the "constitutional doubt" doctrine does not apply mechanically whenever there arises a significant constitutional question the answer to which is not obvious. And precedent makes clear that the Court need not apply (for it has not always applied) the doctrine in circumstances similar to those here—where a constitutional question, while lacking an obvious answer, does not lead a majority gravely to doubt that the statute is constitutional. See, *e. g., Rust,* 500 U. S., at 190–191 (declining to apply doctrine although petitioner's constitutional claims not "without some force"); *id.,* at 204–207 (Blackmun, J., dissenting); *United States* v. *Monsanto,* 491 U. S. 600, 611 (1989); *id.,* at 636 (Blackmun, J., dissenting); *United States* v. *Locke,* 471 U. S. 84, 95 (1985); *id.,* at 120 (STEVENS, J., dissenting).

## III

Invoking several of the Court's precedents, petitioner claims that the Constitution requires Congress to treat recidivism as an element of the offense—irrespective of Congress' contrary intent. Moreover, petitioner says, that requirement carries with it three subsidiary requirements that the Constitution mandates in respect to ordinary, legislatively intended, elements of crimes. The indictment must state the "element." See, *e. g., Hamling* v. *United States,* 418 U. S., at 117. The Government must prove that "element" to a jury. See, *e. g., Duncan* v. *Louisiana,* 391 U. S. 145, 149 (1968). And the Government must prove the "element" beyond a reasonable doubt. See, *e. g., Patterson* v. *New York,* 432 U. S. 197, 210 (1977). We cannot find sufficient support, however, in our precedents or elsewhere, for petitioner's claim.

This Court has explicitly held that the Constitution's Due Process Clause "protects the accused against conviction except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged."

*In re Winship,* 397 U. S. 358, 364 (1970). But *Winship,* the case in which the Court set forth this proposition of constitutional law, does not decide this case. It said that the Constitution entitles juveniles, like adults, to the benefit of proof beyond a reasonable doubt in respect to the *elements* of the crime. It did not consider whether, or when, the Constitution requires the Government to treat a particular fact as an element, *i. e.,* as a "fact necessary to constitute the crime," even where the crime-defining statute does not do so.

*Mullaney* v. *Wilbur,* 421 U. S. 684 (1975), provides petitioner with stronger support. The Court there struck down a state homicide statute under which the State presumed that all homicides were committed with "malice," punishable by life imprisonment, unless the defendant proved that he had acted in the heat of passion. *Id.,* at 688. The Court wrote that "if *Winship* were limited to those facts that constitute a crime as defined by state law, a State could undermine many of the interests that decision sought to protect" just by redefining "the elements that constitut[ed] different crimes, characterizing them as factors that bear solely on the extent of punishment." *Id.,* at 698. It simultaneously held that the prosecution must establish "beyond a reasonable doubt" the nonexistence of "heat of passion"—the fact that, under the State's statutory scheme, distinguished a homicide punishable by a life sentence from a homicide punishable by a maximum of 20 years. *Id.,* at 704. Read literally, this language, we concede, suggests that Congress cannot permit judges to increase a sentence in light of recidivism, or any other factor, not set forth in an indictment and proved to a jury beyond a reasonable doubt.

This Court's later case, *Patterson* v. *New York, supra,* however, makes absolutely clear that such a reading of *Mullaney* is wrong. The Court, in *Patterson,* pointed out that the State in *Mullaney* made the critical fact—the absence of "heat of passion"—*not* simply a potential sentencing factor, *but also* a critical part of the definition of "malice afore-

thought," which was itself in turn "part of" the statute's definition of "homicide," the crime in question. *Patterson,* 432 U. S., at 215–216. (The Maine Supreme Court, in defining the crime, had said that "malice" was "presumed" unless "rebutted" by the defendant's showing of "heat of passion." *Id.,* at 216.) The Court found this circumstance extremely important. It said that *Mullaney* had considered (and held "impermissible") the shifting of a burden of proof *"with respect to a fact which the State deems so important that it must be either proved or presumed."* 432 U. S., at 215 (emphasis added). And the Court then held that similar burden shifting *was* permissible with respect to New York's homicide-related sentencing factor "extreme emotional disturbance." *Id.,* at 205–206. That factor was not a factor that the state statute had deemed "so important" in relation to the crime that it must be either "proved or presumed." *Id.,* at 205–206, 215.

The upshot is that *Mullaney*'s language, if read literally, suggests that the Constitution requires that most, if not all, sentencing factors be treated as elements. But *Patterson* suggests the exact opposite, namely, that the Constitution requires scarcely any sentencing factors to be treated in that way. The cases, taken together, cannot significantly help petitioner, for the statute here involves a sentencing factor— the prior commission of an aggravated felony—that is neither "presumed" to be present, nor need be "proved" to be present, in order to prove the commission of the relevant crime. See 8 U. S. C. § 1326(a) (defining offense elements). Indeed, as we have said, it involves one of the most frequently found factors that affects sentencing—recidivism.

Nor does *Specht* v. *Patterson,* 386 U. S. 605 (1967), which petitioner cites, provide significant additional help, for *Specht* was decided before *Patterson* (indeed before *Winship*); it did not consider the kind of matter here at issue; and, as this Court later noted, the Colorado defendant in *Specht* was "confronted with 'a radically different situation'

from the usual sentencing proceeding." *McMillan* v. *Pennsylvania,* 477 U. S., at 89. At most, petitioner might read all these cases, taken together, for the broad proposition that *sometimes* the Constitution does require (though sometimes it does not require) the State to treat a sentencing factor as an element. But we do not see how they can help petitioner more than that.

We turn then to the case upon which petitioner must primarily rely, *McMillan* v. *Pennsylvania.* The Court there considered a Pennsylvania statute that set forth a sentencing factor—"visibly possessing a firearm"—the presence of which required the judge to impose a minimum prison term of five years. The Court held that the Constitution did *not* require the State to treat the factor as an element of the crime. In so holding, the Court said that the State's "link-[ing] the 'severity of punishment' to 'the presence or absence of an identified fact'" did *not* automatically make of that fact an "element." *Id.,* at 84 (quoting *Patterson* v. *New York, supra,* at 214). It said, citing *Patterson,* that "the state legislature's definition of the elements of the offense is usually dispositive." 477 U. S., at 85. It said that it would not "define precisely the constitutional limits" of a legislature's power to define the elements of an offense. *Id.,* at 86. And it held that, whatever those limits might be, the State had not exceeded them. *Ibid.* Petitioner must therefore concede that "firearm possession" (in respect to a mandatory minimum sentence) does not violate those limits. And he must argue that, nonetheless, "recidivism" (in respect to an authorized maximum) does violate those limits.

In assessing petitioner's claim, we have examined *McMillan* to determine the various features of the case upon which the Court's conclusion arguably turned. The *McMillan* Court pointed out: (1) that the statute plainly "does not transgress the limits expressly set out in *Patterson," ibid.;* (2) that the defendant (unlike *Mullaney's* defendant) did not face "'a differential in sentencing ranging from a nominal

fine to a mandatory life sentence,'" 477 U. S., at 87 (quoting *Mullaney*, 421 U. S., at 700); (3) that the statute did not "alte[r] the maximum penalty for the crime" but "operates solely to limit the sentencing court's discretion in selecting a penalty within the range already available to it," 477 U. S., at 87–88; (4) that the statute did not "creat[e] a separate offense calling for a separate penalty," *id.*, at 88; and (5) that the statute gave "no impression of having been tailored to permit the visible possession finding to be a tail which wags the dog of the substantive offense," but, to the contrary, "simply took one factor that has always been considered by sentencing courts to bear on punishment . . . and dictated the precise weight to be given that factor," *id.*, at 88, 89–90.

This case resembles *McMillan* in respect to most of these factors. But it is different in respect to the third factor, for it does "alte[r] the maximum penalty for the crime," *id.*, at 87; and it also creates a wider range of appropriate punishments than did the statute in *McMillan*. We nonetheless conclude that these differences do not change the constitutional outcome for several basic reasons.

First, the sentencing factor at issue here—recidivism—is a traditional, if not the most traditional, basis for a sentencing court's increasing an offender's sentence. See, *e. g., Parke* v. *Raley*, 506 U. S. 20, 26 (1992) (Recidivism laws "have a long tradition in this country that dates back to colonial times" and currently are in effect in all 50 States); U. S. Dept. of Justice, Office of Justice Programs, Statutes Requiring the Use of Criminal History Record Information 17–41 (June 1991) (50-state survey); USSG §§ 4A1.1, 4A1.2 (Nov. 1997) (requiring sentencing court to consider defendant's prior record in every case). Consistent with this tradition, the Court said long ago that a State need *not* allege a defendant's prior conviction in the indictment or information that alleges the elements of an underlying crime, even though the conviction was "necessary to bring the case within the statute." *Graham* v. *West Virginia*, 224 U. S. 616, 624 (1912). That con-

clusion followed, the Court said, from *"the distinct nature of the issue,"* and the fact that recidivism "does not relate to the commission of the offense, *but goes to the punishment only,* and therefore . . . may be subsequently decided." *Id.,* at 629 (emphasis added). The Court has not deviated from this view. See *Oyler* v. *Boles,* 368 U. S. 448, 452 (1962) (due process does not require advance notice that trial for substantive offense will be followed by accusation that the defendant is a habitual offender); *Parke, supra,* at 27 ("[A] charge under a recidivism statute does not state a separate offense, but goes to punishment only"). And, as we said before, *supra,* at 230, Congress, reflecting this tradition, has never, to our knowledge, made a defendant's recidivism an element of an offense where the conduct proscribed is otherwise unlawful. See *United States* v. *Jackson,* 824 F. 2d 21, 25, and n. 6 (CADC 1987) (opinion of R. Ginsburg, J.) (referring to fact that few, if any, federal statutes make "prior criminal convictions . . . elements of another criminal offense to be proved before the jury"). Although these precedents do not foreclose petitioner's claim (because, for example, the state statute at issue in *Graham* and *Oyler* provided for a jury determination of disputed prior convictions), to hold that the Constitution requires that recidivism be deemed an "element" of petitioner's offense would mark an abrupt departure from a longstanding tradition of treating recidivism as "go[ing] to the punishment only." *Graham, supra,* at 629.

Second, the major difference between this case and *McMillan* consists of the circumstance that the sentencing factor at issue here (the prior conviction) triggers an increase in the maximum permissive sentence, while the sentencing factor at issue in *McMillan* triggered a mandatory minimum sentence. Yet that difference—between a permissive maximum and a mandatory minimum—does not systematically, or normally, work to the disadvantage of a criminal defendant. To the contrary, a statutory minimum binds a sentencing judge; a statutory maximum does not. A mandatory mini-

mum can, as Justice Stevens dissenting in *McMillan* pointed out, "mandate a *minimum* sentence of imprisonment more than twice as severe as the *maximum* the trial judge would otherwise have imposed." 477 U. S., at 95. It can eliminate a sentencing judge's discretion in its entirety. See, *e. g.,* 18 U. S. C. § 2241(c) (authorizing maximum term of life imprisonment for sexual abuse of children; mandating life imprisonment for second offense). And it can produce unfairly disproportionate impacts on certain kinds of offenders. See United States Sentencing Commission, Mandatory Minimum Penalties in the Federal Criminal Justice System 26–34 (Aug. 1991) (discussing "tariff" and "cliff" effects of mandatory minimums). In sum, the risk of unfairness to a particular defendant is no less, and may well be greater, when a mandatory minimum sentence, rather than a permissive maximum sentence, is at issue.

Although *McMillan* pointed to a difference between mandatory minimums and higher authorized maximums, it neither "rested its judgment" on that difference, nor "rejected" the above analysis, as the dissent contends, *post,* at 254. Rather, *McMillan* said that the petitioners' argument in that case would have had "more *superficial* appeal" if the sentencing fact "exposed them to greater or additional punishment." 477 U. S., at 88 (emphasis added). For the reasons just given, and in light of the particular sentencing factor at issue in this case—recidivism—we should take *Mc-Millan's* statement to mean no more than it said, and therefore not to make a determinative difference here.

Third, the statute's broad permissive sentencing range does not itself create significantly greater unfairness. Judges (and parole boards) have typically exercised their discretion within broad statutory ranges. See, *e. g., supra,* at 232, 236 (statutory examples); National Institute of Justice, Sentencing Reform in the United States (Aug. 1985) (survey of sentencing laws in the 50 States); L. Friedman, Crime and Punishment in American History 159–163 (1993)

(history of indeterminate sentencing). And the Sentencing Guidelines have recently sought to channel that discretion using "sentencing factors" which no one here claims that the Constitution thereby makes "elements" of a crime.

Finally, the remaining *McMillan* factors support the conclusion that Congress has the constitutional power to treat the feature before us—prior conviction of an aggravated felony—as a sentencing factor for this particular offense (illegal entry after deportation). The relevant statutory provisions do not change a pre-existing definition of a well-established crime, nor is there any more reason here, than in *McMillan*, to think Congress intended to "evade" the Constitution, either by "presuming" guilt or "restructuring" the elements of an offense. Cf. *McMillan, supra,* at 86–87, 89–90.

For these reasons, we cannot find in *McMillan* (a case holding that the Constitution *permits* a legislature to *require* a longer sentence for gun possession) significant support for the proposition that the Constitution *forbids* a legislature to *authorize* a longer sentence for recidivism.

Petitioner makes two basic additional arguments in response. He points to what he calls a different "tradition"— that of courts having treated recidivism as an element of the related crime. See, *e. g., Massey* v. *United States,* 281 F. 293, 297–298 (CA8 1922); *Singer* v. *United States,* 278 F. 415, 420 (CA3 1922); *People* v. *Sickles,* 51 N. E. 288, 289 (N. Y. 1898); see also *post,* at 256–257 (citing authority). We do not find this claim convincing, however, for any such tradition is not uniform. See *Spencer* v. *Texas,* 385 U. S., at 566 ("The method for determining prior convictions varies . . . between jurisdictions affording a jury trial on this issue . . . and those leaving that question to the court"); Note, Recidivist Procedures, 40 N. Y. U. L. Rev. 332, 347 (1965) (as of 1965, eight States' recidivism statutes provide for determination of prior convictions by judge, not jury). Nor does it appear modern. Compare *State* v. *Thorne,* 129 Wash. 2d

736, 776–784, 921 P. 2d 514, 533–538 (1996) (upholding state recidivism law against federal constitutional challenge), with *State* v. *Furth,* 5 Wash. 2d 1, 11–19, 104 P. 2d 925, 930–933 (1940). And it nowhere (to our knowledge) rested upon a federal constitutional guarantee. See, *e. g., Massey* v. *United States, supra,* at 297 (applying federal law, noting jury determination of prior offense applied "unless the statute designates a different mode of procedure").

Petitioner also argues, in essence, that this Court should simply adopt a rule that any significant increase in a statutory maximum sentence would trigger a constitutional "elements" requirement. We have explained why we believe the Constitution, as interpreted in *McMillan* and earlier cases, does not impose that requirement. We add that such a rule would seem anomalous in light of existing case law that permits a judge, rather than a jury, to determine the existence of factors that can make a defendant eligible for the death penalty, a punishment far more severe than that faced by petitioner here. See *Walton* v. *Arizona,* 497 U. S. 639, 647 (1990) (rejecting capital defendant's argument that every finding of fact underlying death sentence must be made by a jury); *Hildwin* v. *Florida,* 490 U. S. 638, 640–641 (1989) *(per curiam)* (judge may impose death penalty based on his finding of aggravating factor because such factor is not element of offense to be determined by jury); *Spaziano* v. *Florida,* 468 U. S. 447, 465 (1984) (same). And we would also find it difficult to reconcile any such rule with our precedent holding that the sentencing-related circumstances of recidivism are not part of the definition of the offense for double jeopardy purposes. *Graham,* 224 U. S., at 623–624.

For these reasons, we reject petitioner's constitutional claim that his recidivism must be treated as an element of his offense.

## IV

We mention one final point. Petitioner makes no separate, subsidiary, standard of proof claims with respect to his

sentencing, perhaps because he admitted his recidivism at the time he pleaded guilty and would therefore find it difficult to show that the standard of proof could have made a difference to his case. Accordingly, we express no view on whether some heightened standard of proof might apply to sentencing determinations that bear significantly on the severity of sentence. Cf. *United States* v. *Watts*, 519 U. S. 148, 156, and n. 2 (1997) *(per curiam)* (acknowledging, but not resolving, "divergence of opinion among the Circuits" as to proper standard for determining the existence of "relevant conduct" that would lead to an increase in sentence).

The judgment of the Court of Appeals is

*Affirmed.*

JUSTICE SCALIA, with whom JUSTICE STEVENS, JUSTICE SOUTER, and JUSTICE GINSBURG join, dissenting.

Because Hugo Roman Almendarez-Torres illegally reentered the United States after having been convicted of an aggravated felony, he was subject to a maximum possible sentence of 20 years' imprisonment. See 8 U. S. C. § 1326(b)(2). Had he not been convicted of that felony, he would have been subject to a maximum of only two years. See 8 U. S. C. § 1326(a). The Court today holds that § 1326(b)(2) does not set forth a separate offense, and that conviction of a prior felony is merely a sentencing enhancement for the offense set forth in § 1326(a). This causes the Court to confront the difficult question whether the Constitution requires a fact which substantially increases the maximum permissible punishment for a crime to be treated as an element of that crime—to be charged in the indictment, and found beyond a reasonable doubt by a jury. Until the Court said so, it was far from obvious that the answer to this question was no; on the basis of our prior law, in fact, the answer was considerably doubtful.

In all our prior cases bearing upon the issue, however, we confronted a criminal statute or state-court criminal ruling

that unambiguously relieved the prosecution of the burden of proving a critical fact to the jury beyond a reasonable doubt. In *McMillan* v. *Pennsylvania*, 477 U. S. 79 (1986), the statute provided that "'visibl[e] possess[ion] [of] a firearm'" "'shall not be an element of the crime,'" but shall be determined at sentencing by "'[t]he court . . . by a preponderance of the evidence,'" *id.,* at 81, n. 1 (quoting 42 Pa. Cons. Stat. § 9712 (1982)). In *In re Winship,* 397 U. S. 358 (1970), it provided that determinations of criminal action in juvenile cases "'must be based on a preponderance of the evidence,'" *id.,* at 360 (quoting N. Y. Family Court Act § 744(b)). In *Patterson* v. *New York*, 432 U. S. 197 (1977), the statute provided that extreme emotional disturbance "'is an affirmative defense,'" *id.,* at 198, n. 2 (quoting N. Y. Penal Law § 125.25 (McKinney 1975)). And in *Mullaney* v. *Wilbur,* 421 U. S. 684 (1975), Maine's highest court had held that in murder cases malice aforethought was presumed and had to be negated by the defendant, *id.,* at 689 (citing *State* v. *Lafferty,* 309 A. 2d 647 (1973)).

In contrast to the provisions involved in these cases, 8 U. S. C. § 1326 does not, on its face, place the constitutional issue before us: It does not say that subsection (b)(2) is merely a sentencing enhancement. The text of the statute supports, if it does not indeed demand, the conclusion that subsection (b)(2) is a separate offense that includes the violation described in subsection (a) but adds the additional element of prior felony conviction. I therefore do not reach the difficult constitutional issue in this case because I adopt, as I think our cases require, that reasonable interpretation of § 1326 which avoids the problem. Illegal reentry *simpliciter* (§ 1326(a)) and illegal reentry after conviction of an aggravated felony (§ 1326(b)(2)) are separate criminal offenses. Prior conviction of an aggravated felony being an element of the latter offense, it must be charged in the indictment. Since it was not, petitioner's sentence must be set aside.

## I

"[W]here a statute is susceptible of two constructions, by one of which grave and doubtful constitutional questions arise and by the other of which such questions are avoided, our duty is to adopt the latter." *United States ex rel. Attorney General* v. *Delaware & Hudson Co.*, 213 U. S. 366, 408 (1909). This "cardinal principle," which "has for so long been applied by this Court that it is beyond debate," *Edward J. DeBartolo Corp.* v. *Florida Gulf Coast Building & Constr. Trades Council*, 485 U. S. 568, 575 (1988), requires merely a determination of serious constitutional *doubt*, and not a determination of *unconstitutionality*. That must be so, of course, for otherwise the rule would "mea[n] that our duty is to first decide that a statute is unconstitutional and then proceed to hold that such ruling was unnecessary because the statute is susceptible of a meaning, which causes it not to be repugnant to the Constitution." *United States ex rel. Attorney General* v. *Delaware & Hudson Co.*, *supra*, at 408. The Court contends that neither of the two conditions for application of this rule is present here: that the constitutional question is not doubtful, and that the statute is not susceptible of a construction that will avoid it. I shall address the former point first.[1]

---

[1] The Court asserts that we have declined to apply the doctrine "in circumstances similar to those here—where a constitutional question, while lacking an obvious answer, does not lead a majority gravely to doubt that the statute is constitutional." *Ante*, at 239. The cases it cites, however, do not support this contention. In *Rust* v. *Sullivan*, 500 U. S. 173 (1991), the Court believed that "[t]here [was] *no question* but that the statutory prohibition . . . [was] constitutional," *id.*, at 192 (emphasis added). And in *United States* v. *Locke*, 471 U. S. 84 (1985), the Court found the doctrine inapplicable not because of lack of constitutional doubt, but because the statutory language did not permit an interpretation that would "avoid a constitutional question," *id.*, at 96. Similarly, in *United States* v. *Monsanto*, 491 U. S. 600 (1989), "the language of [the statute was] plain and unambiguous," *id.*, at 606.

That it is genuinely doubtful whether the Constitution permits a judge (rather than a jury) to determine by a mere preponderance of the evidence (rather than beyond a reasonable doubt) a fact that increases the maximum penalty to which a criminal defendant is subject is clear enough from our prior cases resolving questions on the margins of this one. In *In re Winship, supra,* we invalidated a New York statute under which the burden of proof in a juvenile delinquency proceeding was reduced to proof by a preponderance of the evidence. We held that "the Due Process Clause protects the accused against conviction except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged," 397 U. S., at 364, and that the same protection extends to "a juvenile . . . charged with an act which would constitute a crime if committed by an adult," *id.,* at 359.

Five years later, in *Mullaney* v. *Wilbur, supra,* we unanimously extended *Winship*'s protections to determinations that went not to a defendant's guilt or innocence, but simply to the length of his sentence. We invalidated Maine's homicide law, under which all intentional murders were presumed to be committed with malice aforethought (and, as such, were punishable by life imprisonment), unless the defendant could rebut this presumption with proof that he acted in the heat of passion (in which case the conviction would be reduced to manslaughter and the maximum sentence to 20 years). We acknowledged that "under Maine law these facts of intent [were] not general elements of the crime of felonious homicide[, but] [i]nstead, [bore] only on the appropriate punishment category." 421 U. S., at 699. Nonetheless, we rejected this distinction between guilt and punishment. "[I]f *Winship,*" we said, "were limited to those facts that constitute a crime as defined by state law, a State could undermine many of the interests that decision sought to protect without effecting any substantive change in its law. It would only be necessary to redefine the elements that constitute differ-

ent crimes, characterizing them as factors that bear solely on the extent of punishment." *Id.*, at 697–698.

In *Patterson* v. *New York*, we cut back on some of the broader implications of *Mullaney*. Although that case contained, we acknowledged, "some language . . . that ha[d] been understood as perhaps construing the Due Process Clause to require the prosecution to prove beyond a reasonable doubt any fact affecting 'the degree of criminal culpability,'" we denied that we "intend[ed] . . . such far-reaching effect." 432 U. S., at 214–215, n. 15. Accordingly, we upheld in *Patterson* New York's law casting upon the defendant the burden of proving as an "affirmative defense" to second-degree murder that he "'acted under the influence of extreme emotional disturbance for which there was a reasonable explanation or excuse,'" *id.*, at 198–199, n. 2, which defense would reduce his crime to manslaughter. We explained that "[p]roof of the nonexistence of all affirmative defenses has never been constitutionally required," *id.*, at 210, and that the State need not "prove beyond a reasonable doubt every fact, the existence or nonexistence of which it is willing to recognize as an exculpatory or mitigating circumstance affecting the degree of culpability or the severity of the punishment." *Id.*, at 207. We cautioned, however, that while our decision might "seem to permit state legislatures to reallocate burdens of proof by labeling as affirmative defenses at least some elements of the crimes now defined in their statutes[,] . . . there are obviously constitutional limits beyond which the States may not go in this regard." *Id.*, at 210.

Finally, and most recently, in *McMillan* v. *Pennsylvania*, 477 U. S., at 81, we upheld Pennsylvania's Mandatory Minimum Sentencing Act, which prescribed a mandatory *minimum* sentence of five years upon a judge's finding by a preponderance of the evidence that the defendant "visibly possessed a firearm" during the commission of certain enumerated offenses which all carried maximum sentences of

more than five years.  We observed that "we [had] never attempted to define precisely the constitutional limits noted in *Patterson, i. e.,* the extent to which due process forbids the reallocation or reduction of burdens of proof in criminal cases," but explained that, whatever those limits, Pennsylvania's law did not transgress them, *id.,* at 86, *primarily because* it "neither alter[ed] the maximum penalty for the crime committed nor create[d] a separate offense calling for a separate penalty; it operate[d] solely to limit the sentencing court's discretion in selecting a penalty within the range already available to it without the special finding of visible possession of a firearm," *id.,* at 87–88.

The feebleness of the Court's contention that here there is no serious constitutional doubt is evidenced by the degree to which it must ignore or distort the analysis of *McMillan.* As just described, that opinion emphasized—and emphasized repeatedly—that an increase of the maximum penalty was not at issue.  Beyond that, it specifically acknowledged that the outcome might have been different (*i. e.,* the statute might have been unconstitutional) if the maximum sentence had been affected:

> "Petitioners' claim that visible possession under the Pennsylvania statute is 'really' an element of the offenses for which they are being punished—that Pennsylvania has in effect defined a new set of upgraded felonies—would have at least more superficial appeal if a finding of visible possession exposed them to greater or additional punishment, cf. 18 U. S. C. § 2113(d) (providing separate and greater punishment for bank robberies accomplished through 'use of a dangerous weapon or device'), but it does not." *Id.,* at 88.

The opinion distinguished one of our own precedents on this very ground, noting that the Colorado Sex Offenders Act invalidated in *Specht* v. *Patterson,* 386 U. S. 605 (1967), increased a sex offender's sentence from a 10-year maximum

to an indefinite term up to and including life imprisonment. 477 U. S., at 88.

Despite all of that, the Court would have us believe that the present statute's alteration of the maximum permissible sentence—which it acknowledges is "the major difference between this case and *McMillan*," *ante*, at 244—militates *in favor of*, rather than *against*, this statute's constitutionality, because an increase of the minimum sentence (rather than the permissible maximum) is more disadvantageous to the defendant. *Ibid.* That is certainly an arguable.position (it was argued, as the Court has the temerity to note, by the *dissent* in *McMillan*). But it is a position which *McMillan* not only rejected, but *upon the converse of which McMillan rested its judgment.*

In addition to inverting the consequence of this distinction (between statutes that prescribe a minimum sentence and those that increase the permissible maximum sentence) the Court seeks to minimize the importance of the distinction by characterizing it as merely one of five factors relied on in *McMillan*, and asserting that the other four factors here are the same. *Ante*, at 242–243. In fact, however, *McMillan* did not set forth any five-factor test; the Court selectively recruits "factors" from various parts of the discussion. Its first·factor, for example, that " 'the statute plainly does not transgress the limits expressly set.out in *Patterson*,' " *ante*, at 242, quoting *McMillan*, 477 U. S, at 86—viz., that it does not "discar[d] the presumption of innocence" or "relieve the prosecution of its burden of proving guilt," *id.*, at 87—merely narrows the issue to the one before the Court, rather than giving any clue to the resolution of that issue. It is no more a factor in solving the constitutional problem before us than is the observation that § 1326 is not an *ex post facto* law and does not effect an unreasonable search or seizure. The Court's second, fourth, and part of its fifth "factors" are in fact all subparts of the crucial third factor (the one that is absent here), since they are all culled from the general dis-

cussion in *McMillan* of how the Pennsylvania statute simply limited a sentencing judge's discretion. We said that, whereas in *Mullaney* the State had imposed "'a differential in sentencing ranging from a nominal fine to a mandatory life sentence'" (the Court's "second" factor), Pennsylvania's law "neither alter[ed] the maximum penalty for the crime committed [the Court's 'third' factor] nor create[d] a separate offense calling for a separate penalty [the Court's 'fourth' factor]; it operate[d] solely to limit the sentencing court's discretion in selecting a penalty within the range already available to it without the special finding of visible possession of a firearm [the Court's 'third' factor]. . . . The statute gives no impression of having been tailored to permit the visible possession finding to be a tail which wags the dog of the substantive offense [part of the Court's 'fifth' factor]." 477 U. S., at 87–88.

The Court's recruitment of "factors" is, as I have said, selective. Omitted, for example, is *McMillan*'s statement that "petitioners do not contend that the particular factor made relevant [by the statute] . . . has historically been treated 'in the Anglo-American legal tradition' as requiring proof beyond a reasonable doubt." *Id.*, at 90, quoting *Patterson*, 432 U. S., at 226. Petitioner does make such an assertion in the present case—correctly, as I shall discuss. But even with its selective harvesting, the Court is incorrect in its assertion that "most" of the "factors" it recites, *ante*, at 243 (and in its implication that all except the third of them) exist in the present case as well. The second of them contrasted the consequence of the fact assumed in *Mullaney* (extension of the permissible sentence from as little as a nominal fine to as much as a mandatory life sentence) with the consequence of the fact at issue in *McMillan* (no extension of the permissible sentence at all, but merely a "limit[ation of] the sentencing court's discretion in selecting a penalty within the range already available," 477 U. S., at 88). The present case resembles *Mullaney* rather than *McMillan* in this regard,

since the fact at issue increases the permissible sentence tenfold. And the only significant part of the fifth "factor"—that the statute in *McMillan* "'dictated the precise weight to be given [the statutory] factor,'" *ante*, at 243, quoting *McMillan, supra*, at 89–90—is likewise a point of difference and *not* of similarity.

But this parsing of various factors is really beside the point. No one can read our pre-*McMillan* cases, and especially *Mullaney* (whose limits were adverted to in *Patterson* but never precisely described), without entertaining a serious doubt as to whether the statute as interpreted by the Court in the present case is constitutional. And no one can read *McMillan*, our latest opinion on the point, without perceiving that the determinative element in our validation of the Pennsylvania statute was the fact that it merely limited the sentencing judge's discretion within the range of penalty already available, *rather than* substantially increasing the available sentence. And even more than that: No one can read *McMillan* without learning that the Court was *open* to the argument that the Constitution requires a fact which does increase the available sentence to be treated as an element of the crime (such an argument, it said, would have "at least . . . superficial appeal," 477 U. S., at 88). If all that were not enough, there must be added the fact that many State Supreme Courts have concluded that a prior conviction which increases maximum punishment must be treated as an element of the offense under either their State Constitutions, see, *e. g., State* v. *McClay*, 146 Me. 104, 112, 78 A. 2d 347, 352 (1951); *Tuttle* v. *Commonwealth*, 68 Mass. 505, 506 (1854) (prior conviction increasing maximum sentence must be set forth in indictment); *State* v. *Furth*, 5 Wash. 2d 1, 11–19, 104 P. 2d 925, 930–933 (1940); *State ex rel. Lockmiller* v. *Mayo*, 88 Fla. 96, 98–99, 101 So. 228, 229 (1924); *Roberson* v. *State*, 362 P. 2d 1115, 1118–1119 (Okla. Crim. App. 1961), or as a matter of common law, see, *e. g., People ex rel. Cosgriff* v. *Craig*, 195 N. Y. 190, 194–195, 88 N. E. 38, 39 (1909); *People*

v. *McDonald*, 233 Mich. 98, 102, 105, 206 N. W. 516, 518, 519 (1925); *State* v. *Smith*, 129 Iowa 709, 710–715, 106 N. W. 187, 188–189 (1906) ("By the uniform current of authority, the fact of the prior convictions is to be taken as part of the offense instantly charged, at least to the extent of aggravating it and authorizing an increased punishment"); *State* v. *Pennye*, 102 Ariz. 207, 208–209, 427 P. 2d 525, 526–527 (1967); *State* v. *Waterhouse*, 209 Ore. 424, 428–433, 307 P. 2d 327, 329–331 (1957); *Robbins* v. *State*, 219 Ark. 376, 380–381, 242 S. W. 2d 640, 643 (1951); *State* v. *Eichler*, 248 Iowa 1267, 1270–1273, 83 N. W. 2d 576, 577–579 (1957).[2]

In the end, the Court cannot credibly argue that the question whether a fact which increases maximum permissible punishment must be found by a jury beyond a reasonable doubt is an easy one. That, perhaps, is why the Court stresses, and stresses repeatedly, the limited subject matter that § 1326(b) addresses—recidivism. It even tries, with utter lack of logic, to limit its rejection of the fair reading of *McMillan* to recidivism cases. "For the reasons just given," it says, *"and in light of the particular sentencing factor at issue in this case—recidivism—we should take*

---

[2] It would not be, as the Court claims, "anomalous" to require jury trial for a factor increasing the maximum sentence, "in light of existing case law that permits a judge, rather than a jury, to determine the existence of factors that can make a defendant eligible for the death penalty . . . ." *Ante*, at 247, citing *Walton* v. *Arizona*, 497 U. S. 639 (1990); *Hildwin* v. *Florida*, 490 U. S. 638 (1989) *(per curiam);* and *Spaziano* v. *Florida*, 468 U. S. 447 (1984). Neither the cases cited, nor any other case, permits a judge to determine the existence of a factor which makes a crime a capital offense. What the cited cases hold is that, once a *jury* has found the defendant *guilty* of *all the elements* of an offense which carries as its maximum penalty the sentence of death, it may be left to the judge to decide whether that maximum penalty, rather than a lesser one, ought to be imposed—even where that decision is constrained by a statutory requirement that certain "aggravating factors" must exist. The person who is charged with actions that expose him to the death penalty has an absolute entitlement to jury trial on *all the elements* of the charge.

*McMillan's* statement [regarding the "superficial appeal" the defendant's argument would have had if the factor at issue increased his maximum sentence] to mean no more than it said, and therefore not to make a determinative difference here." *Ante,* at 245 (emphasis added). It is impossible to understand how *McMillan* could mean one thing in a later case where recidivism is at issue, and something else in a later case where some other sentencing factor is at issue. One might say, of course, that recidivism *should be an exception* to the general rule set forth in *McMillan*—but that more forthright characterization would display how doubtful the constitutional question is in light of our prior case law.

In any event, there is no rational basis for *making* recidivism an exception. The Court is of the view that recidivism need not be proved to a jury beyond a reasonable doubt (a view that, as I shall discuss, is precisely contrary to the common-law tradition) because it " 'goes to the punishment only.' " It relies for this conclusion upon our opinion in *Graham* v. *West Virginia,* 224 U. S. 616 (1912). See *ante,* at 243, quoting *Graham, supra,* at 624; see also *ante,* at 247. The *holding* of *Graham* provides no support for the Court's position. It upheld against due process and double jeopardy objections a state recidivism law under which a defendant's prior convictions were charged and tried in a separate proceeding after he was convicted of the underlying offense. As the Court notes, *ante,* at 243, the prior convictions were not charged in the same indictment as the underlying offense; but they *were* charged in an "information" before the defendant was tried for the prior convictions, and, more importantly, the law explicitly preserved his right to a jury determination on the recidivism question. See *Graham, supra,* at 622–623; see also *Oyler* v. *Boles,* 368 U. S. 448, 453 (1962) (same). It is true, however, that if the *basis* for *Graham's* holding were accepted, one would have to conclude that recidivism need not be tried to the jury and found beyond a reasonable doubt. The essence of *Graham's* reason-

ing was that in the recidivism proceeding the defendant "was not held to answer for an offense," 224 U. S., at 624, since the recidivism charge " 'goes to the punishment only,' " *ibid.*, quoting *McDonald* v. *Massachusetts*, 180 U. S. 311, 313 (1901).

But that basis for dispensing with the protections of jury trial and findings beyond a reasonable doubt was explicitly rejected in *Mullaney*, which *accorded* these protections to facts that were "not general elements of the crime of felonious homicide . . . [but bore] only on the appropriate punishment category," 421 U. S., at 699. Whatever else *Mullaney* stands for, it certainly stands for the proposition that what *Graham* used as the line of demarcation for double jeopardy and some due process purposes (the matter "goes only to the punishment") is *not* the line of demarcation for purposes of the right to jury trial and to proof beyond a reasonable doubt. So also does *McMillan*, which even while narrowing *Mullaney* made it very clear that the mere fact that a certain finding "goes only to the penalty" does not end the inquiry. The Court is certainly correct that the distinctive treatment of recidivism determinations for double jeopardy purposes takes some explaining; but it takes some explaining for the Court no less than for me. And the explanation assuredly is *not* (what the Court apparently suggests) that recidivism is never an element of the crime. It does much less violence to our jurisprudence, and to the traditional practice of requiring a jury finding of recidivism beyond a reasonable doubt, to explain *Graham* as a recidivism exception to the normal double jeopardy rule that conviction of a lesser included offense bars later trial for the greater crime. Our double jeopardy law, after all, is based upon traditional American and English practice, see *United States* v. *Dixon*, 509 U. S. 688, 704 (1993); *United States* v. *Wilson*, 420 U. S. 332, 339–344 (1975), and that practice has allowed recidivism to be charged and tried separately, see *Spencer* v. *Texas*, 385 U. S. 554, 566–567 (1967); *Graham, supra*, at 623,

625–626, 631; *McDonald, supra,* at 312–313.  It has *not* allowed recidivism to be determined by a judge as more likely than not.

While I have given many arguments supporting the position that the Constitution requires the recidivism finding in this case to be made by a jury beyond a reasonable doubt, I do not endorse that position as necessarily correct.  Indeed, that would defeat my whole purpose, which is to honor the practice of not deciding doubtful constitutional questions unnecessarily.  What I have tried to establish—and all that I need to establish—is that on the basis of our jurisprudence to date, the answer to the constitutional question is not clear.  It is the Court's burden, on the other hand, to establish that its constitutional answer shines forth clearly from our cases.  That burden simply cannot be sustained. I think it beyond question that there was, until today's unnecessary resolution of the point, "serious doubt" whether the Constitution permits a defendant's sentencing exposure to be increased tenfold on the basis of a fact that is not charged, tried to a jury, and found beyond a reasonable doubt.  If the Court wishes to abandon the doctrine of constitutional doubt, it should do so forthrightly, rather than by declaring certainty on a point that is clouded in doubt.

## II

The Court contends that the doctrine of constitutional doubt is also inapplicable because § 1326 is not fairly susceptible of the construction which avoids the constitutional problem—*i. e.,* the construction whereby subsection (b)(2) sets forth a separate criminal offense.  *Ante,* at 238.  The Court begins its statutory analysis not by examining the text of § 1326, but by demonstrating that the "subject matter [of the statute]—prior commission of a serious crime—is as typical a sentencing factor as one might imagine."  *Ante,* at 230. That is eminently demonstrable, sounds powerfully good, but in fact proves nothing at all.  It is certainly true that a

judge (whether or not bound by the Federal Sentencing Guidelines) is likely to sentence nearer the maximum permitted for the offense if the defendant is a repeat offender. But the same can be said of many, perhaps most, factors that are used to define aggravated offenses. For example, judges will "typically" sentence nearer the maximum that a statute allows if the crime of conviction is committed with a firearm, or in the course of another felony; but that in no way suggests that armed robbery and felony murder are sentencing enhancements rather than separate crimes.

The *relevant* question for present purposes is not whether prior felony conviction is "typically" used as a sentencing factor, but rather whether, in statutes that provide higher maximum sentences for crimes committed by convicted felons, prior conviction is "typically" treated as a mere sentence enhancement or rather as an element of a separate offense. The answer to that question is the latter. That was the rule at common law, and was the near-uniform practice among the States at the time of the most recent study I am aware of. See Note, Recidivist Procedures, 40 N. Y. U. L. Rev. 332, 333–334 (1965); Note, The Pleading and Proof of Prior Convictions in Habitual Criminal Prosecutions, 33 N. Y. U. L. Rev. 210, 215–216 (1958). At common law, the fact of prior convictions *had* to be charged in the same indictment charging the underlying crime, and submitted to the jury for determination along with that crime. See, *e. g.*, *Spencer* v. *Texas, supra*, at 566; *Massey* v. *United States*, 281 F. 293, 297 (CA8 1922); *Singer* v. *United States*, 278 F. 415, 420 (CA3 1922); *People* v. *Sickles*, 156 N. Y. 541, 545, 51 N. E. 288, 289 (1898). While several States later altered this procedure by providing a separate proceeding for the determination of prior convictions, at least as late as 1965 all but eight retained the defendant's right to a jury determination on this issue. See Note, 40 N. Y. U. L. Rev., at 333–334, 347. I am at a loss to explain the Court's assertion that it has "found no statute that clearly makes recidivism an offense

element" added to another crime, *ante*, at 230. There are many such.[3]

It is interesting that the Court drags the red herring of recidivism through both parts of its opinion—the "constitutional doubt" part and the "statutory interpretation" part alike. As just discussed, logic demonstrates that the nature of that charge (the fact that it is a "typical" sentencing factor) has nothing to do with what this statute means. And as discussed earlier, the text and reasoning of *McMillan*, and of the cases *McMillan* distinguishes, provide no basis for saying that recidivism is exempt from the Court's clear acknowledgment that taking away from the jury facts that increase the maximum sentence is constitutionally questionable. One wonders what state courts, and lower federal courts, are supposed to do with today's mysterious utterances. Are they to pursue logic, and conclude that *all* ambiguous statutes adding punishment for factors accompanying the principal offense are mere enhancements, or are they illogically to give this special treatment only to recidivism? Are they to deem the reasoning of *McMillan* superseded for *all* cases, or does it remain an open and doubtful question, for all cases except those involving recidivism, whether statutory maximums can be increased without the benefit of jury trial? Whatever else one may say about today's opinion, there is no doubt that it has brought to this area of the law more confusion than clarification.

Passing over the red herring, let me turn now to the statute at issue—§ 1326 as it stood when petitioner was con-

---

[3] For federal statutes of this sort, see, *e. g.*, 15 U. S. C. § 1264(a), 18 U. S. C. § 924(c), and § 2114(a). In each of these provisions, recidivism is recited in a list of sentence-increasing aggravators that include, for example, intent to defraud or mislead (15 U. S. C. § 1264(a)), use of a firearm that is a machine gun, or a destructive device, or that is equipped with a silencer (18 U. S. C. § 924(c)), and wounding or threatening life with a dangerous weapon (§ 2114(a)). It would do violence to the text to treat recidivism as a mere enhancement while treating the parallel provisions as aggravated offenses, which they obviously are.

victed. The author of today's opinion for the Court once agreed that the "language and structure" of this enactment "are subject to two plausible readings," one of them being that recidivism constitutes a separate offense. *United States* v. *Forbes,* 16 F. 3d 1294, 1298 (CA1 1994) (opinion of Coffin, J., joined by Breyer, C. J.).[4] This would surely be enough to satisfy the requirement expressed by Justice Holmes, see *United States* v. *Jin Fuey Moy,* 241 U. S. 394, 401 (1916), and approved by the Court, *ante,* at 237–238, that the constitutional-doubt-avoiding construction be "fairly possible." Today, however, the Court relegates statutory language and structure to merely two of five "factors" that "help courts determine a statute's objectives and thereby illuminate its text," *ante,* at 228.

The statutory text reads, in relevant part, as follows:

"Reentry of deported alien; criminal penalties for reentry of certain deported aliens

"(a) Subject to subsection (b) of this section, any alien who [has been deported and thereafter reenters the United States] . . . shall be fined under title 18, or imprisoned not more than 2 years, or both.

"(b) Notwithstanding subsection (a) of this section, in the case of any alien described in such subsection—

"(1) whose deportation was subsequent to a conviction for commission of three or more misdemeanors involving drugs, crimes against the person, or both, or a felony (other than an aggravated felony), such alien shall be fined under title 18, imprisoned not more than 10 years, or both; or

"(2) whose deportation was subsequent to a conviction for commission of an aggravated felony, such alien

---

[4] The statutory text at issue in *Forbes* was in all relevant respects identical to the statute before us here, except that the years of imprisonment for the offenses were less; they were increased by a 1994 amendment, see § 130001(b), 108 Stat. 2023.

shall be fined under such title, imprisoned not more than 20 years, or both." 8 U. S. C. § 1326(b).

One is struck at once by the parallel structure of subsections (a) and (b). *Neither* subsection says that the individual it describes "shall be guilty of a felony," and *both* subsections say that the individuals they describe "shall be fined under title 18, or imprisoned not more than [2, 10, or 20] years." If this suffices to define a substantive offense in subsection (a) (as all agree it does), it is hard to see why it would not define a substantive offense in each paragraph of subsection (b) as well. Cf., for example, 21 U. S. C. § 841, which has a subsection (a) entitled "Unlawful acts," and a subsection (b) entitled "Penalties."

The opening phrase of subsection (b) certainly does not indicate that what follows merely supplements or enhances the penalty provision of subsection (a); what follows is to apply "notwithstanding" all of subsection (a), *i. e.,* "in spite of" or "without prevention or obstruction from or by" subsection (a). See, *e. g.,* Webster's New International Dictionary 1669 (2d ed. 1949). The next phrase ("in the case of any alien described in . . . subsection [(a)]") imports by reference the substantive acts attributed to the hypothetical alien (deportation and unauthorized reentry) in subsection (a). Significantly, this phrase does not apply subsection (b) to any alien "convicted under" subsection (a)—which is what one would expect if the provision was merely increasing the penalty for certain subsection (a) convictions. See, *e. g., United States* v. *Davis,* 801 F. 2d 754, 755–756 (CA5 1986) (noting that "predicat[ing] punishment upon conviction" of another offense is one of the "common indicia of sentence-enhancement provisions"). Instead, subsection (b) applies to an alien "described in" subsection (a)—one who has been deported and has reentered illegally. And finally, subsection (a)'s provision that it applies "[s]ubject to subsection (b)" means that subsection (a) is inapplicable to an alien covered by subsection (b), just as subsection (b) applies "not-

withstanding" that the alien would otherwise be covered by subsection (a).[5]

The Court relies on an earlier version of § 1326 to support its interpretation of the statute in its current form. *Ante,* at 232. While I agree that such statutory history is a legitimate tool of construction, the statutory history of § 1326 does not support, but rather undermines, the Court's interpretation. That earlier version contained a subsection (a) that, in addition to setting forth penalties (as did the subparts of subsection (b)), contained the phrase (which the subparts of subsection (b) did not) "shall be guilty of a felony, and upon conviction thereof . . . ." With such a formulation, of course, it would be easier to conclude that subsection (a) defines the crime and sets forth the basic penalty, and subsection (b) sets forth merely penalty enhancements. But if that was what the additional language in subsection (a) of the 1988 statute connoted, then what was the *elimination* of that additional language (in the 1990 version of the statute at issue here) meant to achieve? See § 543(b)(3), 104 Stat. 5059. The more strongly the "shall be guilty of a felony" language suggests that subsection (b) of the 1988 statute contained only enhancements, the more strongly the otherwise inexplicable elimination of that language sug-

---

[5] The Court contends that treating subsection (b) as establishing substantive offenses renders the "notwithstanding" and "subject to" provisions redundant, because even without them our lesser included-offense jurisprudence would prevent a defendant from being convicted under both subsections (a) and (b). *Ante,* at 231. Redundancy, however, consists of the annoying practice of saying the same thing twice, not the sensible practice of saying once, with clarity and conciseness, what the law provides. The author of today's opinion once agreed that "[t]he fact that each subsection makes reference to the other is simply the logical way of indicating the relationship between the arguably two separate crimes." *United States* v. *Forbes,* 16 F. 3d 1294, 1298 (CA1 1994). But if this be redundancy, it is redundancy that the Court's alternative reading does not cure—unless one believes that, without the "notwithstanding" and "subject to" language, our interpretive jurisprudence would permit the subsection (a) penalty to be added to the subsection (b) penalties.

gests that subsection (b) of the 1990 statute was meant to be *parallel* with subsection (a)—*i. e.*, that both subsections were meant to set forth not merely penalties but also offenses.[6]

After considering the subject matter and statutory language, the third factor the Court considers in arriving at its determination that this statute can only be read as a sentencing enhancement is the title of the 1988 amendment that added subsection (b)(2): "Criminal Penalties for Reentry of Certain Deported Aliens." See § 7345, 102 Stat. 4471, cited *ante*, at 234. Of course, this title pertains to a subsection (b)(2) which, unlike the (b)(2) under which petitioner was convicted, was not parallel with the preceding subsection (a). But even disregarding that, the title of the amendment proves nothing at all. While "Criminal Penalties for Reentry" might normally be more suggestive of an enhancement than of a separate offense, there is good reason to believe it imports no such suggestion here. For the very next provision of the same enactment, which adjusts the *substantive requirements* for the crime of aiding and abetting the unlawful entry of an alien, is entitled "Criminal Penalties for Aiding or Assisting Certain Aliens to Enter the United States." See § 7346, 102 Stat. 4471. Evidently, new substantive offenses that were penalized were simply entitled "Criminal Penalties" for the relevant offense. Moreover,

---

[6] Immediately after stressing the significance of the 1988 version of § 1326(a), the Court dismisses the 1990 amendment that eliminated the 1988 language upon which it relies, as a "housekeeping measure" by which "Congress [did not] inten[d] to change, or to clarify, the fundamental relationship between" subsections (a) and (b). *Ante*, at 234. The Court offers no support for this confident characterization, unless it is the mistaken assumption that statutory changes or clarifications unconfirmed by legislative history are inoperative. "Suffice it to say that legislative history need not confirm the details of changes in the law effected by statutory language before we will interpret that language according to its natural meaning." *Morales* v. *Trans World Airlines, Inc.*, 504 U. S. 374, 385, n. 2 (1992).

the 1988 amendment kept the original title of § 1326 ("Re-entry of Deported Alien") intact, leaving it to apply to both subsection (a) and subsection (b). See § 7345, *supra;* § 276, 66 Stat. 229.

The Court's fourth factor leading it to conclude that this statute cannot reasonably be construed as establishing substantive offenses is legislative history. See *ante,* at 234. It is, again, the legislative history of the provision as it existed in 1988, before subsection (a) was stripped of the language "shall be guilty of a felony," thereby making subsections (a) and (b) parallel. Even so, it is of no help to the Court's case. The stray statements that the Court culls from the Congressional Record prove only that the new subsection (b) was thought to increase penalties for unlawful reentry. But there is no dispute that it does that! The critical question is whether it does it by adding penalties to the subsection (a) offense, or by creating additional, more severely punished, offenses. That technical point is not alluded to in any of the remarks the Court recites.

The Court's fifth and last argument in support of its interpretation of the statute is the contention that "the contrary interpretation . . . risks unfairness," *ibid.,* because it would require bringing the existence of the prior felony conviction to the attention of the jury. But it is also "unfair," of course, to deprive the defendant of a jury determination (and a beyond-a-reasonable-doubt burden of proof) on the critical question of the prior conviction. This Court's own assessment of which of those disadvantages is the greater can be of relevance here only insofar as we can presume that that perception would have been shared by the enacting Congress. We usually presume, however, not that an earlier Congress agreed with our current policy judgments, but rather that it agreed with the disposition provided by traditional practice or the common law. See *United States* v. *Texas,* 507 U. S. 529, 534 (1993); *Astoria Fed. Sav. & Loan Assn.* v. *Solimino,* 501 U. S. 104, 108 (1991); *Norfolk Redevel-*

*opment and Housing Authority* v. *Chesapeake & Potomac Telephone Co. of Va.,* 464 U. S. 30, 35 (1983); *Morissette* v. *United States,* 342 U. S. 246, 263 (1952). As noted earlier, the Court's hostility to jury determination of prior convictions is quite simply at odds with the manner in which recidivism laws have historically been treated in this country.

Moreover, even if we were free to resolve this matter according to our current views of what is fair, the Court's judgment that avoiding jury "infection" is more important than affording a jury verdict (beyond a reasonable doubt) does not seem to me sound. The Court is not correct, to begin with, that the fact of prior conviction is "almost never contested," *ante,* at 235, particularly in unlawful-entry cases. That is clear from the very legislative history of the present statute. Senator Chiles explained that "identifying and prosecuting . . . illegal alien felons is a long and complex process" because "[i]t is not uncommon for an alien who has committed a certain felony to pay his bond and walk, only to be apprehended for a similar crime in the next county but with a new name and identification." 133 Cong. Rec. 8771 (1987). He went on to describe two specific aliens, one from whom police "seized 3 passports issued to him in 3 different names, 11 drivers licenses, immigration cards and numerous firearms and stolen property," and the other on whom immigration officials had "5 alien files . . . with 13 aliases, different birth dates and different social security cards." *Id.,* at 8771, 8772. He said that "these aliens [were] not exceptions but rather common amongst the 100,000 illegal alien felons in the United States." *Id.,* at 8772. Representative Smith stated that aliens arrested for felonies "often are able to pay expensive bonds and disappear under a new identity often to reappear in court with a different name and a new offense. In some cases, they may return to their native lands and reenter the United States with new names and papers but committing the same crimes." *Id.,* at 28840. And on the other side of the ledger, I doubt whether "infection" of the jury

with knowledge of the prior crime is a serious problem. See, *e. g., Spencer*, 385 U. S., at 561 ("The defendants' interests [in keeping prejudicial prior convictions from the jury] are protected by limiting instructions and by the discretion residing with the trial judge to limit or forbid the admission of particularly prejudicial evidence even though admissible under an accepted rule of evidence" (citation omitted)); *Old Chief* v. *United States*, 519 U. S. 172, 191 (1997) (it is an abuse of discretion under Federal Rule of Evidence 403 to disallow defendant's stipulation to prior felony convictions where such convictions are an element of the offense); cf. Brief for National Association of Criminal Defense Lawyers as *Amicus Curiae* 30 ("In 1996, 98.2% of all Section 1326 defendants pleaded guilty"). If it is a problem, however, there are legislative and even judicial means for dealing with it, short of what today's decision does: taking the matter away from the jury in all cases. See Note, 40 N. Y. U. L. Rev., at 333–334 (describing commonly used procedures under which defendant's right to a jury is invoked only "[i]f [he] denies the existence of prior convictions or stands mute"); *Spencer, supra,* at 567 (describing the English rule, under which the indictment alleges both the substantive offense and prior conviction, but the jury is not charged on the prior conviction until after it convicts the defendant of the substantive offense).

In sum, I find none of the four nontextual factors relied upon by the Court to support its interpretation ("typicality" of recidivism as a sentencing factor; titles; legislative history; and risk of unfairness) persuasive. What does seem to me significant, however, is a related statutory provision, introduced by a 1996 amendment, which explicitly refers to subsection (b)(2) as setting forth "offenses." See § 334, 110 Stat. 3009–635 (instructing United States Sentencing Commission to amend sentencing guidelines "for offenses under . . . 1326(b)"). This later amendment can of course not cause subsection (b)(2) to have meant, at the time of petitioner's conviction, something different from what it then

said. But Congress's expressed understanding that subsection (b) creates separate offenses is surely evidence that it is "fairly possible" to read the provision that way.[7]

I emphasize (to conclude this part of the discussion) that "fairly possible" is all that needs to be established. The doctrine of constitutional doubt does not require that the problem-avoiding construction be the *preferable* one—the one the Court would adopt in any event. Such a standard would deprive the doctrine of all function. "Adopt the interpretation that avoids the constitutional doubt if that is the right one" produces precisely the same result as "adopt the right interpretation." Rather, the doctrine of constitutional doubt comes into play when the statute is "susceptible of" the problem-avoiding interpretation, *Delaware & Hudson Co.*, 213 U. S., at 408—when that interpretation is *reasonable,* though not necessarily the best. I think it quite impossible to maintain that this standard is not met by the interpretation of subsection (b) which regards it as creating separate offenses.

\*   \*   \*

For the foregoing reasons, I think we must interpret the statute before us here as establishing a separate offense rather than a sentence enhancement. It can be argued that, once the constitutional doubts that require this course have been resolved, statutes no less ambiguous than the one before us here will be interpretable as sentence enhancements,

---

[7] The Court is incorrect in its contention that the effective-date provision of the 1996 amendments reflects the opposite congressional understanding. See *ante,* at 237. That provision states that the amendments "apply under [subsection (b)] . . . only to violations of [subsection (a)]," occurring on or after the date of enactment. § 321(c), 110 Stat. 3009–628. There is no dispute, of course, that if subsection (b) creates separate offenses, one of the elements of the separate offenses is the lesser offense set forth in subsection (a). The quoted language is the clearest and simplest way of saying that *that element* of the subsection (b) offenses must have occurred after the date of enactment in order for the amendments to be applicable.

so that not much will have been achieved. That begs the question, of course, as to how the constitutional doubt will be resolved. Moreover, where the doctrine of constitutional doubt does not apply, the same result may be dictated by the rule of lenity, which would preserve rather than destroy the criminal defendant's right to jury findings beyond a reasonable doubt. See, e. g., *People ex rel. Cosgriff* v. *Craig*, 195 N. Y., at 197, 88 N. E., at 40 ("It is unnecessary in this case to decide how great punishment the legislature may constitutionally authorize Courts of Special Sessions to impose on a conviction without a common-law jury. It is sufficient to say that in cases of doubtful construction or of conflicting statutory provisions, that interpretation should be given which best protects the rights of a person charged with an offense, to a trial according to the common law"). Whichever doctrine is applied for the purpose, it seems to me a sound principle that whenever Congress wishes a fact to increase the maximum sentence without altering the substantive offense, it must make that intention unambiguously clear. Accordingly, I would find that § 1326(b)(2) establishes a separate offense, and would reverse the judgment below.