UNITED STATES of America,

v.

Francis MEJIA, Defendant.

No. CR. 01–10453–NG.

United States District Court,
D. Massachusetts.

Aug. 5, 2003.

Miriam Conrad, Federal Defender's Office, Boston, MA, for Francis Mejia, Defendant.

Nadine Pellegrini, United States Attorney's Office, Boston, MA, for USA, Plaintiff.

## MEMORANDUM AND ORDER RE: SENTENCING

GERTNER, District Judge.

### I. INTRODUCTION

Francis Mejia ("Mejia") pleaded guilty to making a false statement on an application for a United States passport (in violation of 18 U.S.C. § 1542), and to illegally reentering the United States after having previously been deported (in violation of 8 U.S.C. § 1326(a) and (b)(2)).

While the record shows that Mejia entered and reentered this country at least twice before—illegally, to be sure—it also shows that he worked hard, taking a series of jobs, working in auto repair, cleaning, plumbing, and that he had a stable and close family. (Three of his children are citizens, born in the United States.) By all accounts, he was a doting and responsible father. His explanation for returning after he had been deported was straightforward: His girlfriend was pregnant with his third child. He was concerned that she was deeply depressed—even desperate— and that she seemed unable to care for their children.

But Mejia's record also discloses a serious criminal conviction—for conspiracy to traffic in cocaine. He was sentenced on April 21, 1993 (hereinafter the "1993 conviction") and received three years at M.C.I.-Cedar Junction, one year to serve and the balance suspended, after which he was deported. When he reentered the country yet again, he was convicted of illegal reentry after deportation (before Judge Young of this Court). His sentence was substantially enhanced because of the 1993 drug conviction. On the third illegal reentry (the subject of the instant charge),

however, his counsel moved to vacate the 1993 conviction in state court.

Mejia succeeded in vacating the conviction. But what is significant about that result are the grounds on which he succeeded. His conviction was not vacated on the proverbial "technicality." It was vacated because there was no evidence to suggest that Mejia had ever participated in the alleged conspiracy to traffic cocaine. The conviction was not wrong because of a procedural error, such as the failure of the court to warn the defendant of immigration consequences that would follow from a guilty plea. Rather, it was literally wrong—the government agreed that there was not enough evidence to support a conviction.

Mejia's sentence turns almost entirely on the significance of the vacated drug trafficking conviction. Because of the structure of the Sentencing Guidelines, the 1993 drug trafficking conviction has a double impact—both on Mejia's offense level and on his criminal history score. Under U.S.S.G. § 2L1.2(b)(1), the penalty for Mejia's reentry after deportation is enhanced (1) by 12 levels if the prior conviction was for a felony drug trafficking offense of 13 months or more; (2) by 8 levels if the prior conviction was for an aggravated felony; or (3) by 4 levels if the prior conviction fit the catch-all category of "any other felony." In addition, that conviction increases Mejia's criminal history category substantially, because of the length of the sentence he received in the 1993 case and the sentencing enhancement assigned at his later federal conviction for illegal reentry after deportation.

The Probation Office took the position that Mejia's 1993 conviction remains significant even if vacated. The government pressed for an 8 point enhancement based on the prior illegal entry offense, which was an aggravated felony. Both positions

share a common premise—that the current illegal entry charge depends upon the status of the defendant at the moment of reentry. The defense moved for a 4 point enhancement because Mejia's prior illegal entry offense—ruling out the drug conviction—was simply a conviction for "any other felony."

I could not disagree more with the positions taken by both the government and Probation. Apart from the technicalities of the Guidelines—and there *are* concerns apart from the technicalities of the Guidelines—the positions are illogical. That Mejia should be punished for his two prior efforts to enter this country illegally is clear. But it is surely significant that he did so to find work and to support his family, and not to deal drugs. The issue is not culpability. The issue is what is fair.

Happily, this is not an instance in which the Guidelines require one result, and justice another. As I describe below, the Sentencing Guidelines permit me to take Mejia's circumstances into account.

I sentenced Mejia to 15 months, the time he had already served awaiting trial, followed by two years of supervised release.

### A. *The Statute*

In 1988, Congress passed the Anti–Drug Abuse Act, Pub.L. No. 100–690, 102 Stat. 4181. As part of this enactment, Congress amended 8 U.S.C. § 1326, the section of the code that criminalizes the reentry of an alien who has been previously deported from the United States. *See id.* § 7345(a), 102 Stat. at 4471 (amending 8 U.S.C. § 1326). Specifically, it added subsection (b), which provided additional penalties for those aliens whose previous deportation

followed a criminal conviction. In 1994, Congress amended § 1326 in a provision of the Violent Crime Control and Law Enforcement Act, Pub.L. No. 103–322, 108 Stat. 1796, enhancing the penalties still further. *See id.* § 130001(b), 108 Stat. at 2023. While prior to 1988 the maximum term of imprisonment a defendant could receive for violating § 1326 was two years, by 1994, it was twenty.

### B. *The Guidelines*

The Guideline calculations reflected in the Presentence Report are the following:

### 1. *The Base Offense Level*

Count 1: For the violation of 18 U.S.C. § 1542, false application for a United States passport, Mejia falls under U.S.S.G. § 2L2.2, a base offense level of *8.* The base offense is increased by *2* levels under U.S.S.G. § 2L2.2(b)(1) because the defendant had been deported on October 6, 1993 and again on September 30, 1998. In addition, the base offense is increased by another *2* points because the defendant committed the instant offense after having been convicted of an earlier felony immigration offense, under U.S.S.G. § 2L2.2(b)(2). Finally, the defendant is eligible for a 2 point reduction for acceptance of responsibility, yielding a total offense level of *10.* These computations are uncontested.

Count 2: For the 8 U.S.C. § 1326 violation, reentry into the United States without the Attorney General's permission, Mejia falls under U.S.S.G. § 2L1.2, also a level *8.* He is also entitled to a *3* level[1] reduction for acceptance of responsibility, depending upon his adjusted offense level.

---

1. The reduction for acceptance of responsibility depends upon his total adjusted offense level. Thus, since I found that only the 4 point enhancement was appropriate, Mejia was entitled only to a 2 point reduction for acceptance of responsibility, as his adjusted offense level was below 16. U.S.S.G. § 3E1.1.

The central question with respect to this count—and ultimately, to Mejia's final sentence—is whether the base offense level is to be enhanced by *12, 8,* or *4* levels because of his prior record.

### 2. *Criminal History Score*

Excising the vacated conviction, as everyone agrees must be done, yields a criminal history score of 6, or a level III. The defendant challenges that score under § 4A1.3 of the Guidelines as overrepresenting the defendant's culpability. Without the drug trafficking conviction, the base offense level of the prior charge would have been an 8, and the sentencing range 0–6 months. And if Mejia had not received a sentence of the length he did (33 months) in 1993, he would not have received three additional points in this case because of the timing of the instant offense relative to the timing of the earlier sentence.[2]

### C. *Mejia's Background*

Mejia was born in Bani, Dominican Republic, the youngest of five children. As a child he worked in his father's family-owned grocery store. At 18, he left the Dominican Republic and illegally entered the United States for the first time for the usual reasons—to try to make a better living. He lived with a maternal aunt in New Jersey and did landscaping work in the surrounding communities.

In 1990, Mejia moved to Boston, again seeking better job opportunities. He worked as a house cleaner, then did maintenance work at a church in Cambridge, then auto repair.

On August 23, 1990, Mejia was arrested for drug trafficking. He was getting into a car in front of his brother's building at the moment when police were about to execute a search warrant for his brother's apartment. The police stopped him and took his keys—which included keys to his brother's apartment. They found no drugs on Mejia, and nothing in the car. They then executed the search warrant and found Mejia's brother, Victor, and another man inside, attempting to dispose of cocaine. Released pending trial, Victor fled to the Dominican Republic.

Mejia faced the charges. What happened then is a cautionary tale of how "aliens" are treated in these circumstances: Mejia pleaded guilty to conspiracy to violate the controlled substance laws—even though his counsel should have seen that there was no factual basis whatsoever for the plea, and that none was presented to the Court. One can only assume that it was easier for Mejia to plead guilty and hasten his inevitable deportation than to actually challenge the government's case.

On March 21, 1993, the Court imposed a three to five year MCI–Cedar Junction term, with one year to serve and the balance suspended. Mejia was incarcerated from November 16, 1992, until September 8, 1993.

While awaiting trial, Mejia met Maria Ledesma. Some time later Ledesma gave birth to the couple's first child. But Mejia could not enjoy his new child. After serving his sentence, he was deported back to the Dominican Republic. He and Maria remained in touch by phone and letter.

---

**2.** Probation concluded that at the time the instant offense was committed, the defendant was under the criminal justice sentence imposed by Judge Young on January 8, 1997, warranting an addition of two points to his criminal history score under U.S.S.G. § 4A1.1(d). In addition, the instant offense was committed less than two years following his release from custody on the earlier offense, adding one more point to his score pursuant to U.S.S.G. § 4A1.1(e).

On his return, Mejia resided with his parents and again assisted his father in the family grocery store. Anxious to see his child, however, he reentered the United States. He worked as a plumber, taking whatever jobs he could find. Ms. Ledesma gave birth to their second child.[3]

Three years later, on March 22, 1996, Mejia was arrested, this time charged with the federal offense of illegal reentry after deportation. Sentenced before Judge Young of this Court, Mejia received a 33 month sentence, the sentence substantially enhanced because of the prior drug conviction.

By September 30, 1998, Mejia was deported a second time.

He resumed his work in the family store and maintained contacts with Ms. Ledesma and his growing family. She scraped together funds to visit him in the Dominican Republic. After one such visit, however, Mejia reported that he became concerned about Ms. Ledesma's state of mind. Pregnant now with their third child, he thought that she seemed "desperate," unable to cope with his absence.

Again Mejia entered the United States and resumed his life with Ms. Ledesma and their three children. He continued his work—auto repair, cleaning services—until his arrest on the instant charge in November of 2001.

Even while in pretrial detention, Mejia's children and family visited him. He took pains to write them regularly, five or six long letters per week. His sisters visited him weekly; he called his parents in the Dominican Republic as often as he was able.

This time, Mejia reports he intends to make a permanent change, to break the pattern of illegal reentry, arrest, deportation. Ms. Ledesma put a deposit on a house in Bani, Dominican Republic, and will relocate there with their children. She has returned on several occasions to finalize the purchase. Mejia, as is his wont, will work two jobs if necessary to support the family. Probation reports:

> The defendant hopes that he will be able to raise his children and help his parents when he is released from custody. He advises that he wants to 'make something' out of his children so that they will not have to live the life that he has been living ... his father has offered to allow him to take over the operation of El Tatual, his father's grocery store, when he returns to the Dominican Republic, and that his brother in law has offered him a job with his construction company.

### D. *Vacating the 1993 Drug Conviction*

During the plea colloquy to the 1993 charges, the state prosecutor represented the following:

> An officer testified [at Grand Jury] that on August 24th of 1990, at around seven o'clock, members of the Drug Control Unit went to 10 Cameron Street to execute a search warrant. They observed the defendant leaving 10 Cameron Street with a woman and get into a car.

> They stopped the car and spoke to [Mr. Mejia], at which time he had keys in his hand, and they took the keys from him. They went back to the apartment, and

---

**3.** At some point during this stay, the defendant and Ms. Ledesma became estranged and Mejia began a relationship with Nalda Baez, with whom he had a child. Notwithstanding this relationship, Mejia and Ledesma reconciled before his return to the Dominican Republic; indeed, the presentence report suggests that both Mejia and Ledesma have maintained contacts with Ms. Baez and her child.

the keys were used to enter the apartment.

The officers went inside, and they observed two men in a back room. One of them was about to throw an object which looked to be a white powder in a glassine into a bucket. The officer ran over to him and stopped him. He took cocaine from him that he was about to throw into chlorine.

Astonishingly, Mejia's counsel stood mute and allowed him to plead guilty to drug conspiracy charges, when there was no reason to suspect he was involved at all.

In contrast, Mejia's able current counsel moved to vacate the conviction, and the state prosecutor, to his credit, confessed error. He agreed that Mejia's plea had not been "intelligently made" and, further, that there had been an inadequate factual basis for the plea. As to the possibility of future charges, the prosecutor noted:

> The evidence of conspiracy is insufficient to prove the case beyond a reasonable doubt. The evidence of trafficking, which was dismissed as part of the plea and is subject to a motion to reinstate, is insufficient to prove the case beyond a reasonable doubt.

The government not only agreed that the conviction had to be vacated; it entered a *nolle prosequi* as to all charges.

### E. *Legal Framework*

#### 1. *Guidelines*

Section 2L1.2 pivots the sentence for illegal entry after deportation on whether reentry followed certain types of convictions and varies the enhancement accordingly:

B) a conviction for a felony drug trafficking offense for which the sentence imposed was 13 months or less, increase by 12 levels;

C) a conviction for an aggravated felony, increase by 8 levels;

D) a conviction for any other felony, increase by 4 levels.

Probation recommends a 12 level enhancement because the defendant stood convicted of a qualifying felony drug trafficking offense at the time he reentered. The government argues for 8 levels because the prior federal reentry conviction was, at the very least, an "aggravated felony" under 8 U.S.C. § 1101(a)(43)(O), since it took place at a time when the defendant was a convicted felon. The common premise of both positions is that the current charge is a status offense, dependent upon the nature of Mejia's prior convictions.

■ I agree that illegal entry after deportation is a status offense, but I disagree as to the nature of the predicate status. The status that is an element of this offense is the status of having been an alien previously ordered deported from this country. The basis of that prior deportation—whether a misdemeanor, felony, aggravated offense or drug trafficking conviction—relates to the extent of the sentence, not to the nature of the offense. The goal of the statute, 8 U.S.C. § 1326, was to address recidivism. *See Almendarez–Torres v. United States*, 523 U.S. 224, 230, 118 S.Ct. 1219, 140 L.Ed.2d 350 (1998)(finding that the enhancements of § 1326 are sentencing factors, rather than elements of the offense). If Mejia's criminal record is adjusted to eliminate a significant conviction, his sentencing profile changes as well.[4]

---

4. This is not inconsistent with the position that I took in *United States v. Leviner*, 31 F.Supp.2d 23 (D.Mass.1998), which addressed the charge of felon in possession of a firearm, under 18 U.S.C. § 922(g). I concluded that § 922(g) involved a status offense,

Although § 2L1.2 does not explicitly address what is to happen when a conviction that ordinarily would enhance the sentence is vacated, other sections of the Guidelines do. Application Note 6 to U.S.S.G. § 4A1.2 bars the consideration of convictions that "have been ruled constitutionally invalid" for the purposes of determining a defendant's criminal history count. And that provision, U.S.S.G. § 4A1.2, is cross-referenced in both the substantive provisions of U.S.S.G. § 2K2.1 (governing firearms offenses) and the criminal record provisions of § 4B1.2 (governing career offenders). Notably, for firearm offenses described in § 2K2.1, Application Note 15 suggests that if a given conviction does not count for criminal history purposes under § 4A1.2, then it should also not factor into the base offense level for the crime. In other words, if at the time of the possession of a firearm, the defendant had two felony convictions, but one was later vacated, both the base offense level and the criminal history score are altered.

The commentary to § 2L1.2, although badly drafted, suggests the same approach:

> If all or any part of a sentence of imprisonment was probated, suspended, deferred, or stayed, "sentence imposed" refers only to the portion that was not probated, suspended, deferred, or stayed.

U.S.S.G. § 2L1.2 cmt. app. note 1(A)(iv).[5] This section directs the court to consider the sentence actually imposed, not just the sentence announced by the trial court and then suspended. It suggests that if that sentence is vacated—unimposed, if you will—it ought not be counted.

█ In any event, even if the meaning of this provision is unclear, as it plainly is, the rule of lenity, not to mention logic, suggests a parallel interpretation of § 2L1.2 and § 2K2.1. If enhancements to this offense are characterized as sentencing factors, then the crucial time period for evaluating what enhancements apply is the time of the sentencing.

In Mejia's case, when the 1993 drug conviction was vacated, it could no longer serve as the basis for either the 12 level or the 8 level enhancement. He stood before the Court as a defendant who had a single prior conviction for illegal entry after deportation, which entitled him to a 4 level enhancement (base offense of 8, plus 4, minus 2 for acceptance of responsibility, leading to an offense level of 10, with a criminal history score of III, and a Guideline range of 10–16 months).

In any event, as I note below, even if I were to adopt the government's position—to enhance Mejia's sentence by 8 levels—I would still reduce his criminal history score because of the impact of the vacated conviction. (Base offense of 8, plus 8, minus 3, yields an offense level of 13, with

---

an element of which was the nature of the felony of which the defendant had been convicted at the time that he possessed a firearm. *Id.* at 26. Offenses that Leviner committed after the date of his firearm possession would not change his base offense level.

5. In Application Note 4 the drafters explain: "An adjustment under subsection (b)(1) or (b)(2) for a prior felony conviction applies in addition to any criminal history points added for such conviction in Chapter Four, Part A (Criminal History)." While the First Circuit,

in *United States v. Luna–Diaz,* 222 F.3d 1 (1st Cir.2000), interpreted that commentary to mean that criminal history points are not related to the computation of the base offense level here, *i.e.,* that an offense can be excised for the purposes of the former, but counted for the latter, *id.* at 5, there is another interpretation. This commentary reflects the Commission's view that it is not "double counting" to factor in a conviction for substantive purposes under § 2L1.2 and for criminal history purposes under Chapter Four.

a criminal history score of II, and a Guideline range of 15–21 months).

Either approach would yield the same result—time served.

### 2. *Case Law*

The government takes the position that this approach is inconsistent with the case law of this Circuit. I disagree. It cannot be that a vacated conviction based on actual innocence is irrelevant in assessing culpability.

In *United States v. Luna–Diaz*, 222 F.3d 1 (1st Cir.2000), the defendant was convicted of reentry after deportation. *Id.* at 2. At the time of deportation he had been convicted of an aggravated felony. *Id.* Prior to sentencing however, the aggravated felony had been vacated because the defendant had not been advised of the possibility of deportation upon a guilty plea when he in fact pleaded guilty. *Id.* at 3. The district court refused to impose the 16 level enhancement, and the First Circuit reversed. *Id.* at 2.[6]

But *Luna–Diaz* explicitly left open the possibility that the enhancement would not apply when a conviction is vacated as a result of constitutional error or a claim of innocence. *See id.* at 6 n. 5. The Court noted:

> One caveat is appropriate. The instant case does not require us to decide whether allowing § 2L1.2(b)'s enhancement to rest on a prior conviction vacated as a result of constitutional infirmity, egregious error of law, or determination

of innocence, might in some limited circumstances raise constitutional due process concerns.

In my judgment, this case raises precisely the due process concerns that the First Circuit highlighted.[7]

Mejia pleaded guilty to an offense that he did not commit, for which there was no factual basis, on which he was abysmally represented.

Finally, if § 2L1.2 looks to the portrait of the offender that prior convictions paints—to determine whether the defendant is a recidivist and, if so, of what sort of crimes—then the portrait Mejia presents to this Court after the conviction was vacated differs dramatically from that presented before. To be sure, Mejia is a recidivist immigration offender. But he comes into this country as thousands have before him—to find a better life, economic success, to be reunited with family. He does not come into this country for the purpose of dealing drugs.

### F. *Criminal History*

■ Even if I were to take the government's approach, though I believe it incorrect, I would depart downward on criminal history grounds under § 4A1.3, concluding that category III "significantly over-represents the seriousness" of the defendant's prior offenses.

Consider the following: Because of his drug conviction, Mejia was deported for the first time without having the chance to

---

6. Significantly, the Court in *Luna–Diaz* did not consider the impact of Note 1(A)(iv) on § 2L1.2—or the significance of *Almendarez–Torres*.

7. In *United States v. Johnstone*, 251 F.3d 281 (1st Cir.2001), a prior conviction had not yet been vacated but was in the process of being challenged. *Id.* at 283. The defendant claimed that he had received ineffective assis-

tance of counsel because his trial lawyer had failed to advise the defendant of his right to consular notification, and of the effect of the plea on his immigration status. *Id.* Though the First Circuit held that the sentence would remain unchanged if his state conviction were vacated, *id.* at 285, it did not discuss the constitutional issue acknowledged in *Luna–Diaz*.

apply for voluntary departure under 8 U.S.C. § 1254(e)(1) (repealed Sept. 30, 1996). Had he been granted a voluntary departure, prosecution for illegal reentry would have been precluded under 8 U.S.C. § 1326, because he would have had no prior convictions and the law, at any rate, applied only to aliens who have been "denied admission, excluded, deported or removed."

Moreover, in the case before Judge Young, the drug conviction enhanced Mejia's exposure by 12 levels; without the drug conviction Mejia would not have qualified for any enhancement beyond the base offense level of 8. In addition, he stood before the court with a criminal history of II because of the length of the 1993 conviction sentence—one year—rather than a criminal history score of I. As a result, he received a sentence of 33 months, rather than a sentence in the range of 0 to 6 months. Moreover, because of that sentence and its timing, he received an additional 3 points: He committed the instant offense less than two years after his sentence was served and while under the term of supervised release. *See* U.S.S.G. § 4A1.1(d) and 4A1.1(e).

All told, considering Mejia's real record—had all constitutional processes been working, as they were supposed to—his criminal history score should have been reduced by four points, earning him a criminal history II rather than criminal history III range.

## II. *SENTENCE*

I reach my sentence through two alternative calculations: If I accept the government's position that Mejia's sentence should be enhanced by 8 levels, yielding an offense score of 13 and a criminal history score of III, I would depart downward to a criminal history score of II and a range of 15–21 months. If I accept the defendant's position, that Mejia's sentence should be enhanced by 4 levels, yielding an offense score of 10 (as he would be eligible for only a 2 point reduction for acceptance of responsibility) and a criminal history level of II, I would sentence in the range of 8 to 14 months.

Mr. Mejia has already served nearly sixteen months. I sentenced him to time served and supervised release on all counts to be served concurrently.

**SO ORDERED.**