TJOFLAT, Circuit Judge, specially
concurring:
I.
I concur in the court’s judgment. I write separately because I disagree with the court’s rationale for vacating appellants’ sentences. The court vacates the sentences because, in the language of Rodriguez, “ ‘there is a reasonable probability’ that both Appellants would have received a different sentence ‘if the guidelines had been applied in an advisory instead of binding fashion by the sentencing judge in this case.’ ” Ante at 1301 (quoting Rodriguez, 398 F.3d at 1301). In other words, the court is satisfied that appellants have satisfied the third element of the plain-error test; they have established prejudice' — that the error “affects [their] substantial rights.” Ante at 1300 (quoting Rodriguez, 398 F.3d at 1298) (internal quotation marks omitted).
I do not fault the court for having required appellants to show such prejudice because Rodriguez is the law of this circuit. I submit that Rodriguez was wrong when decided and continues to be bad law. See United States v. Rodriguez, 406 F.3d 1261, 1281 (11th Cir.2005) (Tjoflat, J., dissenting from denial of rehearing en banc). As I have explained, “Booker constitutional error is structural error.” Id. at 1291.[1] As such, it is “not subject to substantial-rights analysis .... ” Id. at 1292.
In deciding whether to vacate a defendant’s sentence in a case of constitutional error, as we have here, Rodriguez and its progeny require us to examine the record (created, of course, under the pre-Booker sentencing model) for some indication that the district court would have imposed a lesser sentence had the law permitted it to treat the guidelines as advisory rather than mandatory. We look to what the court said prior to or in the course of imposing sentence. We look for what I call “magic words.” In this case, the court finds them. It discovered that “[a]t several points [during the sentencing hearing] the District Court expressed its dissatisfaction with the sentence it was imposing *1303 on Ms. Thompson, noting that the sentence was ‘severe’ and asking ‘whether this is really the kind of defendant Congress intended to be looking] at 360 months as a minimum.’ ” Ante at 1301. The District Court continued, “I don’t think she deserves to be imprisoned for 360 months.” Ante at 1301 (internal quotation marks omitted). Subsequently, “[w]hen sentencing Mr. Stratton, the District Court expressed similar sentiments, announcing that it ‘continue[d] to have [the] same concerns or similar concerns with regard to the length of a sentence of a first offender.’ The District Court also stated that, although the sentence it would impose would be substantial, it had ‘decided long ago not to fudge with the guidelines just to find a result that find it more palatable.’ ” Ante at 1301. And so, finding these magic words, the court vacates appellants’ sentences and remands the case for resen-tencing under the new Booker model.
II.
The court’s opinion illustrates one of many problems with the Rodriguez standard or, as I coin it, the “magic words” approach to plain-error review. Under Rodriguez, we do not generally reverse a sentence unless the district court has stated on the record that the guideline sentence is too high — and, by implication, unfair and unjust — that it would select a lower sentence if the law allowed it to do so, and that it is in general dissatisfied with the punishment provided for by democratically empowered lawmakers. That is, we vacate a sentence only where the judge has spoken some combination of these “magic words.” Thus, at oral argument, if defense counsel begins a plain-error Booker argument, I immediately ask whether we will find any “magic words” in the record; if the answer is “no,” then there is no reason for counsel to pursue the issue further.
A district judge who makes such comments may do so in the sincere belief that over time he or she, along with other like-minded judges, will persuade the Sentencing Commission or Congress to revise severe mandatory sentences. The judge may also think he or she is simply giving the defendant or his family a bit of encouragement. See, e.g., United States v. Ameline, 409 F.3d 1073, 1082 (9th Cir.2005) (en banc) (“District court judges often make remarks at sentencing for purposes other than fact-finding. A district court judge may choose to say some encouraging words for the benefit of the defendant’s family.... ”). Or the judge may simply hope that the defendant will not hold a lengthy sentence against the judge personally. The least charitable view, however, is that the judge is just shooting the breeze and, in the process, doing the defendant and society a great disservice.
When a judge tells a defendant that his sentence is unjust and unfair, the defendant is inclined to believe him. The defendant is, therefore, unlikely to accept the justice of his punishment and “ ‘enter the correctional system in a frame of mind that affords hope for success in rehabilitation over a shorter period of time than might otherwise be necessary.’ ” McKune v. Lile, 536 U.S. 24, 36-37, 122 S.Ct. 2017, 2026, 153 L.Ed.2d 47 (2002) (quoting Brady v. United States, 397 U.S. 742, 753, 90 S.Ct. 1463, 1471, 25 L.Ed.2d 747 (1970)); see also 18 U.S.C. § 3553(a)(2)(D) (“The court, in determining the particular sentence to be imposed, shall consider the need for the sentence imposed to provide the defendant with needed [rehabilitation] in the most effective manner....”). The judge may also unwittingly encourage the defendant to persist in attacking his sentence on direct appeal and collateral review, notwithstanding that its substance and the manner of its imposition are legal *1304 ly correct. After all, why should the defendant not appeal a sentence that even the judge criticized as too severe? Finally, by openly disparaging the defendant’s sentence, the judge fosters disrespect for the rule of law. See 18 U.S.C. § 3553(a)(2)(A) (“The court, in determining the particular sentence to be imposed, shall consider the need for the sentence imposed to ... promote respect for the law....”). If the judge does not respect the law that he applies, then why should society at large? A judge’s role is to apply the law as it is written, not to offer his or her own opinions of its wisdom or fairness. By his oath of office, the judge has sworn to uphold the law, including laws imposing mandatory sentences.[2]
The Rodriguez rule encourages judges to continue opining on the record as to the fairness of sentences they impose in individual cases. Post-Booker, of course, there is no reason for judges to continue doing so in this precise context because the Guidelines are now advisory — if the judge thinks a guideline sentence is unfair, then he or she presumably will exercise the prerogative not to impose it. Supreme Court precedents upholding mandatory mínimums based on extra-verdict judicial findings and extra-verdict enhancements based on prior convictions ever are now thought by some to be in doubt. See Harris v. United States, 536 U.S. 545, 567-68, 122 S.Ct. 2406, 2419-20, 153 L.Ed.2d 524 (2002) (mandatory mínimums) (5-4 decision); Almendarez-Torres v. United States, 523 U.S. 224, 226-27, 118 S.Ct. 1219, 1222, 140 L.Ed.2d 350 (1998) (5-4 decision).[3] Judges who are required to impose what they deem to be unfair or unjust sentences as the result of such laws are encouraged by Rodriguez to state then-criticisms on the record. Moreover, beyond these immediate issues, there will always be a possibility that some unanticipated ruling will, post-sentencing, call into question a sentence on a ground not advanced in the district court, thereby triggering Rodriguez’s, “magic words” requirement. Thus, any time a judge is required to impose an “unjust” sentence, he should, according to Rodriguez, tell the defendant all about the injustice being done to him so that the defendant can receive the benefit of any subsequent appellate decisions. Finally, even putting aside Rodriguez’s impact on future sentencing hearings, I find it troubling that our decisions applying its standard appear to give past comments of this sort the imprimatur of this court. The logical implication of such cases is that such statements are at least harmless — if not desirable — because we reward the de *1305 fendant based on their presence in the record.
I add these additional thoughts on the Rodriguez standard after listening to a series of oral arguments in which the Booker/Rodriguez debate has consisted entirely of defense counsel arguing that the record does indeed contain some “magic words” and the Assistant U.S. Attorney responding that the words just aren’t magical enough. This process is as arbitrary as it is absurd. A defendant is rewarded with a new sentencing hearing only if the sentencing judge took the entirely inappropriate step of publicly criticizing the law that required him to impose the sentence. In contrast, a defendant whose sentence was imposed without gratuitous comment by the sentencing judge is denied a new hearing. “It [is] a mistake to infer from a district court’s silence that the district court would not have made a different decision under a different sentencing scheme.” Ameline, 409 F.3d at 1082. Silence often means nothing more than that an experienced judge understands his or her proper role in the criminal justice system. Thus, the judge’s comments or silence inevitably turns out to be poor circumstantial evidence of what the judge would do if freed from the constraints imposed by the Guidelines.[4]

. Booker established a new sentencing model, markedly and structurally different from the pre-Booker model under which appellants were sentenced. I explained the difference between the two models in considerable detail in dissenting from the court’s refusal to rehear Rodriguez en banc. Rodriguez, 406 F.3d at 1286-91 (Tjoflat, J., dissenting from denial of rehearing en banc). Because the Booker model is materially different from the previous model, the effects of Booker error "are necessarily unquantifiable and indeterminate.” Id. at 1298 (quoting Sullivan v. Louisiana, 508 U.S. 275, 281-82, 113 S.Ct. 2078, 2083, 124 L.Ed.2d 182 (1993)) (internal quotation marks omitted).

. Such comments are quintessential^ political statements. I do not suggest that there is never a time or place for them. The time and place for them, however, is outside the judicial role, in letters or testimony to the Sentencing Commission or Congress. When a judge makes such statements in specific cases and to specific defendants, the judge’s potential for positive influence is not only greatly diminished, but is in fact far outweighed by the disservice done to rule-of-law values, to the criminal justice system in general, and to the defendant in particular.

. In Shepard v. United States, - U.S. -, 125 S.Ct. 1254, 161 L.Ed.2d 205 (2005), Justice Thomas, a member of the majority in the 5-4 Almendarez-Torres decision, wrote that "Almendarez-Torres ... has been eroded by [the] Court's subsequent Sixth Amendment jurisprudence, and a majority of the Court now recognizes that Almendarez-Torres was wrongly decided.” Shepard, 125 S.Ct. at 1264 (Thomas, J., concurring) (citing, inter alia, Apprendi v. New Jersey, 530 U.S. 466, 520-21, 120 S.Ct. 2348, 2379, 147 L.Ed.2d 435 (2000) (Thomas, J., concurring)). He further suggested that, “in an appropriate case, [the] Court should consider Almendarez-Tor-res ’ continuing viability” because "[innumerable criminal defendants have been unconstitutionally sentenced under [its] flawed rule....” Shepard, 125 S.Ct. at 1264 (Thomas, J., concurring).

. As the Ninth Circuit observed,
District court judges often make remarks at sentencing for purposes other than fact-finding. A district court judge may choose to say some encouraging words for the benefit of the defendant’s family; a district court judge may decide to lecture the defendant with a warning. District court judges have also been known to make stray comments about the Guidelines during sentencing, without necessarily intending for them to be interpreted as meaning that a different sentence would have been imposed under a discretionary sentencing scheme. It would be a mistake for us to attribute fresh meaning to comments made in an entirely different context. It would also be a mistake to infer from a district court’s silence that the district court would not have made a different decision under a different sentencing scheme. In sum, in this unusual context, our ability to assess plain error based on the cold record is significantly impaired.
Ameline, 409 F.3d at 1082.