In the

# United States Court of Appeals

## For the Seventh Circuit

No. 11-2340

UNITED STATES OF AMERICA,

*Plaintiff-Appellee*,

*v.*

STEVEN J. NIGG,

*Defendant-Appellant*.

Appeal from the United States District Court
for the Eastern District of Wisconsin.
No. 10-CR-273—**William C. Griesbach**, *Judge*.

ARGUED DECEMBER 1, 2011—DECIDED JANUARY 31, 2012

Before EASTERBROOK, *Chief Judge*, CUDAHY, *Circuit Judge*, and PRATT, *District Judge*.*

PRATT, *District Judge*. Under the Armed Career Criminal Act ("ACCA"), any person convicted of being a felon in possession of a firearm who has "three

---

* The Honorable Tanya Walton Pratt, District Judge for the United States District Court for the Southern District of Indiana, is sitting by designation.

previous convictions . . . for a violent felony . . . committed on occasions different from one another" is subject to a mandatory minimum prison term of fifteen years. 18 U.S.C. § 924(e)(1). On June 6, 2011, the district judge in this case sentenced Steven J. Nigg—who has three prior felony armed robbery convictions, all of which stem from a crime spree that occurred more than thirty-five years ago—to the mandatory minimum sentence under the ACCA, to be followed by three years of super-vised release. *See* 18 U.S.C. §§ 922(g) and 924(e)(1).

Months prior to being sentenced, Nigg pled guilty to the charge of possession of a firearm by a felon, but reserved the right to challenge his status as an Armed Career Criminal ("ACC"). Initially, the district judge expressed misgivings about the fairness of a fifteen-year sentence, but nonetheless found that Nigg qualified as an ACC. On appeal, Nigg raises a wide variety of arguments challenging his sentence. For the following reasons, we affirm the sentence imposed by the district judge.

## I. Background

In November 1976, at the age of twenty-one, Nigg and his cohort, Dennis Oberheim, embarked on an extensive Arizona crime spree which included at least three armed robberies. On November 3, 1976, Nigg and Oberheim robbed a motel clerk at gunpoint and stole $372.75. The next day, the men robbed two convenience store clerks at gunpoint, making off with $100.00. On November 8, 1976, the duo robbed a gas station, taking a

pair of gloves, a pack of Kool cigarettes, and $197.72. On March 9, 1977, roughly four months later, Nigg was convicted of three counts of armed robbery with a gun in Maricopa County, Arizona. He received a concurrent sentence of fifteen to thirty years in prison on each armed robbery count, and additional charges were dismissed as part of a plea agreement.

Following his release from prison in 1990, Nigg walked a more straight and narrow path. He moved to Wisconsin, where he cared for his father's ailing wife until she died. Following her death, Nigg continued to live with his father, until he remarried. Nigg also contributed to his community. Prior to sentencing, the district judge received "numerous letters of support testifying to Nigg's kind and generous character, his willingness to help neighbors, and his involvement in community activities, notably marital arts classes for youth and annual appearances as a volunteer Santa Claus and Easter Bunny." But, even after his release, Nigg's behavior was less than saintly. Specifically, between 1990 and his father's death in 2009, Nigg received two misdemeanor convictions which resulted in fines—criminal damage to property in 1998 and obstructing an officer in 2003. Nigg also failed to pay a series of tax warrants filed by the State of Wisconsin.

In 2009, however, Nigg's life took a sharp turn for the worse. His father passed away, and he became executor of the estate. In a somewhat cruel twist of fate, the estate included over 120 firearms. Nigg's stepmother soon became suspicious that Nigg was selling firearms

in violation of the probate court's restraining order. Wary that Nigg was depleting assets, she hired a private investigator to attempt to purchase firearms. On September 4, 2009, the investigator entered Nigg's consignment shop (which he ran out of his home) and purchased two rifles from Nigg for $1,600.00. Thereafter, the investigator and Nigg's stepmother disclosed the results of their sting operation to agents from the Bureau of Alcohol, Tobacco, Firearms and Explosives ("ATF").

The ATF's subsequent investigation resulted in Nigg's arrest and indictment. Specifically, the ATF agent learned that, during Nigg's transaction with the private investigator, Nigg showed the investigator a printed list of firearms from his father's estate. Notations on the list indicated that some of the guns had been sold and some had been shipped to an auction house in Maine. Moreover, the ATF agent reviewed a deposition transcript taken in a civil action that Nigg's stepmother commenced against the estate. During his deposition, Nigg testified that, in his capacity as executor, he had decided to sell some his father's guns and divide the proceeds among the named beneficiaries.

On December 14, 2010, a federal grand jury in the Eastern District of Wisconsin returned a one-count indictment charging Nigg with possession of firearms by a convicted felon as an ACC, in violation of 18 U.S.C. §§ 922(g)(1) and 924(e). As noted above, the ACCA imposes a fifteen-year mandatory minimum sentence on an offender who has three previous convictions "for a violent felony . . . committed on occasions different from one another." 18 U.S.C. § 924(e)(1).

On January 19, 2011, Nigg pled guilty to the felon in possession charge, but reserved the right to challenge his status as an ACC. On May 5, 2011, in a written opinion, the district judge rejected these challenges. In doing so, however, the district judge expressed "moral concerns" about the overall fairness of a fifteen-year sentence, highlighting the following considerations: Nigg is 55 years old; he had a difficult childhood; and "the predicate offenses for Nigg's ACC designation are almost thirty-five years old . . . [and] he appears to have led a substantially crime-free and, in some respects, exemplary life since he was released from prison in 1990[.]" Nonetheless, the district judge recognized that his hands were tied by mandatory minimum sentence terms, writing that "[b]ecause Nigg qualifies as an ACC, the Court is required by law to impose a sentence of at least fifteen years no matter what its own views may be." But because of his initial misgivings about the harshness of the sentence, the district judge invited the government to voluntarily file supplemental briefing explaining why it was seeking a seemingly draconian sentence under the ACCA.

Apparently, the government's supplemental briefing (which chronicled the full extent of Nigg's 1976 crime spree and many of his questionable post-release decisions) assuaged the district judge's concerns. At sentencing, the district judge commented that Nigg's character "isn't as . . . clean and as reputable as certainly my initial request for supplemental briefing suggested." Among other things, the government emphasized that "[f]or the past 15-20 years, Nigg has possessed several

guns that were not part of his father's estate," and "[h]e has refused to turn over these guns or reveal their location." Finally, on June 6, 2011, the district judge imposed the fifteen-year mandatory minimum prison term to be followed by three years of supervised release, thus giving rise to this appeal.

## II. Analysis

It is difficult to overstate the ramifications of Nigg's status as an ACC. Simple possession of a firearm by a felon is punishable by a term of imprisonment not to exceed ten years. 18 U.S.C. § 924(a)(2). An ACC charged with possession of a firearm, by contrast, is subject to a mandatory minimum sentence of fifteen years in prison and a maximum of life. 18 U.S.C. § 924(e)(1).

Faced with this comparatively harsh punishment, Nigg makes a diverse array of arguments challenging his sentence. Specifically, Nigg contends that his sentence violates the separation of powers doctrine, the Due Process Clause of the Fifth Amendment, his Sixth Amendment right to a jury trial, and the Eighth Amendment's protections against cruel and unusual punishment. Nigg also argues that the ACCA does not apply because of the timing and nature of his prior Arizona felony convictions.

At oral arguments, Nigg's counsel seemingly conceded that, given the current state of the law, at least some of his arguments were destined to fail. Nonetheless, counsel expressed optimism that a loss before this

Court would be a mere bump in the road on the way to a hard-fought victory at the United States Supreme Court. In at least one respect, counsel's intuition was correct: none of the above arguments carry the day before this Court. Finally, where, as here, the arguments involve legal questions (including constitutional challenges), we conduct a *de novo* review. *United States v. Figueroa-Espana*, 511 F.3d 696, 705 (7th Cir. 2007).

## A. Separation of Powers.

Nigg's separation of powers argument goes as follows: giving prosecutors unfettered discretion to use prior convictions against defendants robs the judiciary of discretion, thus violating the separation of powers doctrine. Along these lines, many judges and academics have vociferously criticized the rigidity of mandatory minimum sentences, arguing that they amount to a legislative encroachment on the judiciary's territory. *See, e.g., United States v. Sidhom*, 144 F. Supp. 2d 41, 41 (D. Mass. 2001) ("[T]he government . . . now has the power to determine the severity of the punishment. As a result, courts are required to react passively as automatons and to impose a sentence which the judge may personally deem unjust."); *United States v. Patillo*, 817 F. Supp. 839, 841 (C.D. Cal. 1993) ("I . . . will no longer apply this law without protest, and with no hope for change. Statutory mandatory minimum sentences create injustice because the sentence is determined without looking at the particular defendant."); Erik Luna & Paul G. Cassell, *Mandatory Minimalism*, 32 CARDOZO L. REV. 1, 1 (2010)

("A mandatory minimum deprives judges of the flexibility to tailor punishment to the particular facts of the case and can result in an unduly harsh sentence."); John S. Martin, Jr., *Why Mandatory Minimums Make No Sense*, 18 NOTRE DAME J.L. ETHICS & PUB. POL'Y 311, 312 (2004) ("The reason the judges are opposed to mandatory minimums is not that they are power hungry but rather that they see on a day-to-day basis the injustice that results from inflexibility in sentencing, whether it be a result of mandatory minimums or the result of a restriction of judicial discretion under the sentencing guidelines."). The United States Sentencing Commission recently joined in this chorus of criticism. *See* United States Sentencing Commission, *Report to the Congress: Mandatory Minimum Penalties in the Federal Criminal Justice System* 368 (Oct. 2011), http://www.ussc.gov/Legislative_ and_Public_Affairs/__Congressional_Testimony_and_ Reports/Mandatory_Minimum_Penalties/20111031_RtC_ Mandatory_Minimum.cfm. (last visited Jan. 23, 2012*)* ("[M]andatory minimum penalties . . . should (1) not be excessively severe, [and] (2) be narrowly tailored to apply only to those offenders who warrant such punishment . . . ."). Tracking this criticism, Nigg argues that "[b]y seeking to apply the enhanced sentence in this case, the Court's role with respect to sentencing was terminated and the prosecutor decided what sentence to impose."

Nigg's policy arguments may be fertile ground for a vigorous debate where reasonable minds can disagree. Given the state of the law, however, such debate is little more than academic fodder. It is well-settled that "Con-

gress has the power to define criminal punishments without giving the courts any sentencing discretion[,]" as "[d]eterminate sentences were found in this country's penal codes from its inception[.]" *Chapman v. United States*, 500 U.S. 453, 467 (1991) (citations omitted). As this Court recently recognized, "We have rejected separation of powers challenges to mandatory minimum sentences, and we see no reason to revisit that holding here." *United States v. Brucker*, 646 F.3d 1012, 1019 (7th Cir. 2011); *see also United States v. Carraway*, 612 F.3d 642, 646-47 (7th Cir.2010) (rejecting as meritless the argument that a mandatory life sentence for dealing crack cocaine violates the doctrine of separation of powers); *United States v. MacEwan*, 445 F.3d 237, 252 (3d Cir. 2006) ("Mandatory minimum sentencing provisions do restrict, or in some cases strip, the courts of the power to impose an individually-crafted sentence for a specific defendant; nevertheless, we cannot agree that the use of mandatory minimums violates the doctrine of separation of powers."). The reasoning in these cases applies with equal force here.

## B. Fifth Amendment Due Process.

Next, Nigg argues that the mandatory minimum sentence scheme under the ACCA violates his Fifth Amendment Due Process right to an individualized sentence determination. To bolster this contention, Nigg relies heavily on *United States v. Dyck*, 287 F. Supp. 2d 1016 (D.N.D. 2003) for the proposition that "[t]he concept of individualized sentencing is deeply rooted in legal tradi-

tion and is a fundamental liberty interest." *Id*. at 1021. Notably, the district judge's opinion in *Dyck* was written as a dissent after a reversal by the Eighth Circuit Court of Appeals. *Id*. at 1017.

As discussed, in some instances, mandatory minimum sentences prevent a judge from fashioning a sentence for a particular defendant based on that defendant's unique characteristics. *See Patillo*, 817 F. Supp. at 842 (under the mandatory minimum approach, it makes no difference whether the "defendant has rescued fifteen children from a burning building, or had won the Congressional Medal of Honor"). Importantly, this Court has never recognized a constitutional right to individualized sentencing in non-capital cases. As stated in *United States v. Smith*, 953 F.2d 1060 (7th Cir. 1992), "a sentencing scheme 'not considering individual degrees of culpability would clearly be constitutional.'" *Id*. at 1065 (quoting *Chapman*, 500 U.S. at 467); *see also United States v. Franklin*, 547 F.3d 726, 735 (7th Cir. 2008) ("[T]he Supreme Court and this court have consistently held that mandatory minimum sentences are not a violation of a defendant's due process rights.").

Nigg argues that this all changed in the wake of *United States v. Booker*, 543 U.S. 220 (2005), because sentencing guidelines are now advisory, not mandatory. Nigg argues that it inescapably follows that district judges must be given discretion to determine whether a sentence is appropriate for a particular defendant. But, the district judge gave Nigg a *mandatory minimum sentence*. We have consistently rejected the argument that

mandatory minimums are incompatible with *Booker*: "Nothing in *Booker* gives a judge any discretion to disregard a mandatory minimum." *United States v. Lee*, 399 F.3d 864, 866 (7th Cir. 2005); *Brucker*, 646 F.3d at 1016 ("We have stated on numerous occasions that *Booker* has no effect on statutory minimum sentences . . . ."). For these reasons, Nigg's Fifth Amendment arguments (and his similar arguments relating to judicial discretion) fail.

## C.  Sixth Amendment Right to a Jury Trial.

Nigg also argues that because his prior convictions were not proven to a jury beyond a reasonable doubt, the use of those convictions violates his Sixth Amendment right to a jury trial. Nigg acknowledges that this argument collides head-on with Supreme Court precedent. *See Almendarez-Torrez v. United States*, 523 U.S. 224 (1998); *see also United States v. Thornton*, 463 F.3d 693, 699-700 (7th Cir. 2006) (rejecting the claim "that the jury was required to pass on the existence of all qualifying convictions" under the ACCA); *United States v. Salahuddin*, 509 F.3d 858, 863 (7th Cir. 2007) ("A prior conviction need not be put to a jury before it may be used to enhance a defendant's sentence."). The Supreme Court's decision in A*lmendarez-Torrez* remains intact; therefore, we reject Nigg's argument.

## D.  Did Nigg's Prior Convictions Qualify as Three Violent Felonies?

Nigg next argues that the district judge erred when determining that the government met its burden of

proof to establish the existence of three prior violent felonies to warrant application of the ACCA. In support of this claim, Nigg makes two basic sub-arguments.

First, Nigg argues that his three prior felony convictions—all based on armed robberies that occurred within a six-day window—should not be viewed as three separate episodes. Rather, they should be viewed as a single episode because each robbery was part and parcel of a single crime spree. To reiterate, under the ACCA, the violent felonies at issue must be "committed on occasions different from one another." 18 U.S.C. § 924(e)(1). To determine whether the felonies were committed on different occasions, the operative test analyzes whether the crimes were committed *sequentially* or *simultaneously*. *United States v. Hudspeth*, 42 F.3d 1015, 1021 (7th Cir. 1994) (*en banc*) (defendant committed three separate violent felonies under the ACCA when he broke into three separate businesses located in a strip mall within thirty-five minutes); *United States v. Thomas*, 280 F.3d 1149, 1159 (7th Cir. 2002) (robberies were committed on different occasions because they occurred on different dates and involved different victims). In sum, "[c]ases interpreting the ACCA clearly uphold the minimum fifteen-year sentence enhancement for criminals who commit separate crimes against different individuals while on a spree, within a short period of time, provided that the perpetrator had the opportunity to cease and desist from his criminal actions at any time." *Hudspeth*, 42 F.3d at 1020.

Using this standard, Nigg's crimes were obviously committed in a sequential fashion, as it is physically

impossible for one person to commit three armed robberies simultaneously at three different locations against three different victims on three different dates. In this sense, Nigg's circumstances are easily distinguishable from the cases on which he relies. *See, e.g., United States v. Fuller*, 453 F.3d 274, 278-79 (5th Cir. 2006) (court could not determine "as a matter of law that the burglaries occurred on different occasions" where there was evidence that defendant and his friend entered two different buildings simultaneously).

Nigg next contends that his prior convictions for armed robbery *with a gun* do not constitute "violent felonies" under the ACCA. Specifically, the ACCA defines a "violent felony" as follows:

> any crime punishable by imprisonment for a term exceeding one year . . . that . . . (i) has as an element the use, attempted use, or threatened use of physical force against the person of another; or (ii) is burglary, arson, or extortion, involves use of explosives, or otherwise involves conduct that presents a serious potential risk of physical injury to another[.]

18 U.S.C. § 924(e)(2)(B).

The crux of Nigg's argument is that because Dennis Oberheim was the leader of the crime spree, the nature and extent of Nigg's involvement is unclear, and it would be speculative to classify his prior convictions as *violent* felonies without additional judicial fact-finding. This argument rests on a faulty premise: that the classification of the conviction isn't all that important. To the contrary, we employ a "categorical" approach when

determining whether a crime is a violent felony. *United States v. Fife*, 624 F.3d 441, 445 (7th Cir. 2010); *Begay v. United States*, 553 U.S. 137, 141 (2008) ("In determining whether this crime is a violent felony, we consider the offense generically, that is to say, we examine it in terms of how the law defines the offense and not in terms of how an individual offender might have committed it on a particular occasion.").

Under this approach, we first identify the offense involved and then focus on "the particular elements of the statutory offense, without consideration of the underlying facts of the individual case." *Fife*, 624 F.3d at 445. But some statutes may be violated in several different ways, "such as a statute which creates more than one crime or one that defines one crime with multiple enumerated modes of commission." *Id*. (citations omitted). And, at times, the statute may be violated in a way that does not constitute a violent felony under the ACCA. *Id*. When this situation arises, it becomes critical to "determine precisely which offense is involved within that statutory scheme." *Id*. Under these conditions, courts may employ a more searching "'modified categorical approach' to determine the statutory offense at issue." *Id*. This "modified" approach allows a court to review a limited universe of documents, such as the charging document, the plea agreement, or the transcript of the colloquy between the judge and the defendant. *Id*. Even under the "modified" approach, however, "the inquiry must remain an objective one," focused on the offense itself, not the individual's actions. *Id*.

Here, we need not venture into the modified categorical approach. In 1976, Arizona defined "robbery" as the "felonious taking of personal property in the possession of another from his person, or immediate presence, and against his will, accomplished by means of force or fear." ARIZ. REV. STAT. ANN. § 13-641 (1956). And if the robbery was "committed by a person armed with a gun," it was punished with a minimum prison term determined by whether it was a first, second, or subsequent offense. ARIZ. REV. STAT. ANN. § 13-643(B) (1956). Moreover, by 1976, Arizona had abolished the distinction between accomplices before-the-fact and principals, treating "all persons concerned in the commission of a crime" as principals. ARIZ. REV. STAT. ANN. §§ 13-138 to 140 (1956).

Nigg's only colorable argument is that the last disjunctive phrase of the Arizona robbery statute, "or fear," does not necessarily involve "the use, attempted use, or threatened use of physical force." However, we have squarely rejected similar arguments in the past. *See United States v. Tirrell*, 120 F.3d 670, 680-81 (7th Cir. 1997) ("attempted unarmed robbery" under Michigan law qualified as a violent felony under the ACCA; "under Michigan law, the element of putting in fear means threatening the use of physical force against the person of another"); *see also Thomas*, 280 F.3d at 1159 ("robbery by intimidation" under Georgia law qualified as a violent felony); *United States v. Dickerson*, 901 F.2d 579, 584 (7th Cir. 1990) ("robbery" under Illinois law qualified as a violent felony). More importantly, this argument ignores the fact that Nigg was convicted of three counts of armed robbery *with a gun*. Introducing a gun into a robbery

necessarily creates a fear of physical injury to the victim. *See United States v. Taylor*, 179 Fed. Appx. 957, 961 (7th Cir. 2006) ("The two armed robberies are unquestionably 'violent felonies' under Section 924(e)(1) . . . ."). So far as the record and the Arizona statutes are concerned, Nigg directly committed each of the armed robberies. Without further belaboring the point, suffice it to say that armed robbery *with a gun* clearly fits the bill for a violent felony under 18 U.S.C. § 924(e)(2)(B)(i).

**E. Eighth Amendment.**

Finally, Nigg argues that a fifteen-year sentence is so grossly disproportionate to his crime that it constitutes cruel and unusual punishment under the Eighth Amendment. The Supreme Court has recognized that "[t]he Eighth Amendment, which forbids cruel and unusual punishment, contains a narrow proportionality principle that applies to noncapital sentences." *Ewing v. California*, 538 U.S. 11, 20 (2003) (citations and internal quotations omitted). But "narrow" does not equate to strict proportionality. *Id*. Only extreme sentences that are "grossly disproportionate" to the crime will be deemed cruel and unusual. *Id*.

In determining whether a sentence was grossly disproportionate, the Supreme Court has outlined a three-factor test, which considers: (1) "the gravity of the offense and the harshness of the penalty"; (2) "the sentences imposed on other criminals in the same jurisdiction"; and (3) "the sentences imposed for commission of the same crime in other jurisdictions." *Solem v. Helm*,

463 U.S. 277, 292 (1983). The first factor is a threshold factor; if an inference of gross disproportionality is not established, the analysis ends there. *United States v. Gross*, 437 F.3d 691, 692-93 (7th Cir. 2006).

A quick review of the case law strongly reinforces that the first factor generally presents an insurmountable bar. "Outside the context of capital punishment, successful challenges to the proportionality of particular sentences have been exceedingly rare." *Rummel v. Estelle*, 445 U.S. 263, 272 (1980); *see, e.g., Ewing*, 538 U.S. 11, 28-30 (affirming sentence of twenty-five years to life imposed for felony grand theft of three golf clubs under three strikes law); *Lockyer v. Andrade*, 538 U.S. 63, 73-77 (2003) (upholding sentence of fifty years to life for two shoplifting incidents involving nine videotapes under three strikes law); *Harmelin v. Michigan*, 501 U.S. 957, 961 (1991) (affirming life in prison without the possibility of parole for first-time offender possessing 672 grams of cocaine); *Hutto v. Davis*, 454 U.S. 370, 370-71 (1982) (no constitutional error with forty-year sentence for possession with intent to distribute and distribution of approximately nine ounces of marijuana); *Rummel*, 445 U.S. at 265-66 (upholding life in prison without the possibility of parole under three strikes law where triggering offense was obtaining $120.75 by false pretenses and the loss amount of the two previous fraud felonies was $80.00 and $28.36, respectively); *but see Solem*, 463 U.S. at 296-97 (Eighth Amendment prohibited a sentence of life without the possibility of parole where the defendant had previously committed six "minor" and "nonviolent" felonies and his triggering offense was uttering a "no account" check for $100.00).

Under the circumstances, the decision in *United States v. Hayes*, 919 F.2d 1262 (7th Cir. 1990) is particularly instructive. In that case, Hayes faced a mandatory minimum of fifteen years' imprisonment under the ACCA after purchasing two shotguns and two pistols from a licensed dealer. *Id*. at 1263-64. Two of his predicate convictions were over thirty years old (two armed robberies that occurred within hours of each other), and the other was more than fifteen years old (aggravated battery of a police officer). *Id*. at 1265. In rejecting Hayes's Eighth Amendment challenge, "this court has on numerous occasions held that 'a mandatory minimum sentence of fifteen years for a defendant with three prior felony convictions (and who has now been convicted of yet another felony) is not constitutionally disproportionate.'" *Id*. at 1265 (quoting *United States v. Dombrowski*, 877 F.2d 520, 526 (7th Cir. 1989), *cert. denied*, 496 U.S. 907, 110 S.Ct. 2592, 110 L.Ed.2d 272 (1990); *United States v. Sanchez*, 859 F.2d 483, 486 (7th Cir. 1988), *cert. denied*, 489 U.S. 1021, 109 S.Ct. 1144, 103 L.Ed.2d 204 (1989)). It is clear that, under this precedent, Nigg's circumstances do not give rise to an inference of gross disproportionality.

Nigg counters that *Booker* has fundamentally altered the proportionality analysis because it requires district courts to consider the sentencing objectives and factors under 18 U.S.C. § 3553. But, importantly, *Booker* did nothing to alter the legal landscape of the Eighth Amendment. Applying binding precedent, we reject Nigg's Eighth Amendment arguments. *See United States v. Moore*, 643 F.3d 451, 456 (6th Cir. 2011) ("[W]e are aware of no court of appeals decision that has struck down the Armed

Career Criminal Act as violative of the Eighth Amendment.").

### III. Conclusion

Reasonable minds can and do disagree on the propriety of mandatory minimum sentences. And, here, we have some sympathy for Mr. Nigg, whose dangerous past caught up with him decades after he had seemingly done some work to rehabilitate himself. Nonetheless, the ACCA is the law of the land, and "[p]unishment for federal crimes is a matter for Congress, subject to judicial veto only when the legislative judgment oversteps constitutional bounds." *Warden, Lewisberg Penitentiary v. Marreto*, 417 U.S. 653, 664 (1974). In other words, Nigg's arguments are largely directed to the wrong branch of government; relief from any unfairness flowing from mandatory minimum sentences must come from the legislature, not the judiciary. *MacEwan*, 445 F.3d at 252.

For the foregoing reasons, Nigg's sentence is AFFIRMED.